# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

| | |
|---|---|
| **JIMMY DEAN HARRIS**,<br><br>        Petitioner/Appellant,<br><br>v.<br><br>**TERRY ROYAL**, Warden,<br>Oklahoma State Penitentiary,<br><br>        Respondent/Appellee. | **Case No.  17-6109**<br><br>**(Capital Case)**<br><br>District Court: CIV-08-375-F<br>(W.D. Okla.) |

On Appeal from the United States District Court
for the Western District of Oklahoma
Case No. CIV-08-375-F
The Honorable Stephen P. Friot, Federal District Judge

---

## OPENING BRIEF OF PETITIONER/APPELLANT,
## JIMMY DEAN HARRIS

---

JACK FISHER
Okla. Bar # 2939
Fisher Law Office
P. O. Box 1976
Edmond, OK 73083
Telephone:  (405) 235-9466
Facsimile:   (405) 340-7269
Okfishlaw@aol.com

EMMA V. ROLLS
Okla. Bar # 18820
Assistant Federal Public Defender
215 Dean A. McGee, Suite 707
Oklahoma City, OK  73102
Telephone:  (405) 609-5975
Facsimile:   (405) 609-5976
Emma_Rolls@fd.org

COUNSEL FOR PETITIONER/APPELLANT,
JIMMY DEAN HARRIS

**ORAL ARGUMENT IS REQUESTED**

July 2, 2018

# **TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

ATTACHMENTS TO OPENING BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

PRIOR OR RELATED APPEALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

## PROPOSITION ONE

Mr. Harris Was Denied Effective Assistance of Trial Counsel at His 2005 Penalty Retrial When Counsel Failed to Investigate and Present Mr. Harris's Intellectual Disability as a Bar to Eligibility for Execution under *Atkins V. Virginia*.. . . . . . .  12

A.    Where the Claim Was Raised  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
B.    Arguments and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

      1.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
      2.    Trial Counsel Performed Deficiently . . . . . . . . . . . . . . . . . . . . . .  16
      3.    The District Court Erred by Endorsing the OCCA's Prejudice
            Determination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

      i.   Significantly sub-average intellectual functioning . . . . . . . . . . . 29

      ii.  Significant limitations in adaptive functioning . . . . . . . . . . . . . . 37

C.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## PROPOSITION TWO

Petitioner was Denied Effective Assistance of Counsel When Trial Counsel Failed to Investigate, Develop, and Present Available Evidence of Mental Illness as Mitigation in the 2005 Penalty Retrial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A.     Where the Claims Were Raised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.     Arguments and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    1.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    2.     Treatment by the Lower Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    3.     Trial Counsel's Attempt to Introduce Evidence of Mr. Harris's Unexplained Mental Illness Through An Unqualified Witness Was Objectively Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    4.     Prejudice from Counsel's Failures . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        i.   Trial Counsel's Ineffectiveness Opened the Door to the Prosecutor's False Claim Mr. Harris Was Malingering .. . . . . . . . 61

        ii.  Evidence of Harris's Mental Illness Was Not Double-Edged . . . . 62

        iii.  Trial Counsel Presented No Credible Explanation for Mr. Harris's Violent Behavior. There Exists a Reasonable Probability That Evidence of Untreated Mental Illness Would Have Influenced the Jury's Appraisal of His Moral Culpability and Resulted in a Sentence less than Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    5.     Failure to Grant an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . 69

## PROPOSITION THREE

The Jury Instruction Defining Mitigating Circumstances Given in Mr. Harris's Case along with the Prosecution's Manipulation of Such Instruction Precluded at Least One Juror's  Consideration of Important Mitigating Evidence in Violation of the Sixth, Eighth, and Fourteenth Amendments.. . . . . . . . . . . . . . . . . . . . . . . . . . 72

A.     Where the Claims Were Raised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
B.     Arguments and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    1.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
    2.     The Prosecution's Exploitation of the Infirm Instruction . . . . . . . . . 74
    3.     Treatment by the Lower Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
    4.     The District Court Erred by Endorsing the OCCA's
        Unreasonable Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

        i.  The Constitutionality of the Instruction . . . . . . . . . . . . . . . . . . . . 79
        ii.  Prosecutorial Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

C.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

## PROPOSITION FOUR

Improper Victim-Impact Testimony, Including Requests for a Death Sentence, had a Substantial and Injurious Effect on the Sentencing Verdict; in the Alternative, Such Requests Constitute Structural Error.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

A.     Where the Claim Was Raised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
B.     Exhaustion and Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
C.     Constitutional Error Ignored . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

    1.     Mr. Harris's Case is Far Less Aggravated than *Dodd v. Trammell* . . 91
    2.     Incompatibility with Oklahoma's Scheme . . . . . . . . . . . . . . . . . . . . 94

D.     This Error Was Far From Harmless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
E.     Structural Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

PROPOSITION FIVE

The Accumulation of Errors and Prejudice From the 2005 Penalty Retrial Violated
Petitioner's Rights Under the Fifth, Sixth, Eighth, and Fourteenth Amendments..101

A.    Where the Claim Was Raised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
B.    Arguments and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101


CONCLUSION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . 107

CERTIFICATE OF DIGITAL SUBMISSION . . . . . . . . . . . . . . . . . . . . . . . . . 108

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT . . . . . . . . 108

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109


**ATTACHMENTS TO OPENING BRIEF:**

Attachment 1:     Memorandum Opinion and Judgment, *Harris v. Royal*, Case No.
                  CIV-08-375-F (W.D. Okla. Apr. 19, 2017) (Docs. 77, 78).

Attachment 2:     *Harris v. State*, 84 P.3d 731 (Okla. Crim. App. 2004) (state court
                  decision regarding first direct appeal), D-2001-1268, *reversed and
                  remanded for resentencing*).

Attachment 3:     *Harris v. State*, 164 P.3d 1103 (Okla. Crim. App. 2007) (state court
                  decision regarding second direct appeal), D-2005-117, *affirmed.*

Attachment 4:     *Harris v. State*, 167 P.3d 438 (Okla. Crim. App. 2007) (state court
                  decision regarding post-conviction appeal), PCD-2005-665, *denied*.

iv

## <u>TABLE OF AUTHORITIES</u>

## <u>SUPREME COURT CASES</u>

*Abdul–Kabir v. Quarterman*, 550 U.S. 233 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 69

*Atkins v. Virginia*, 536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . 13, 26, 36, 37, 73, 103

*Berger v. United States*, 295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Bobby v. Bies*, 556 U.S. 825 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Booth v. Maryland*, 482 U.S. 496 (1987) . . . . . . . . . . . . . . . . . . . . . . . . 87, 97, 98, 99

*Bosse v. Oklahoma*, 137 S. Ct. 1 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Boyde v. California*, 494 U.S. 370 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . 89, 100, 106

*Brumfield v. Cain*, 135 S. Ct. 2269 (2015) . . . . . . . . . . . . . . . . . . . . . 24, 27, 38, 52

*Chambers v. Mississippi*, 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Darden v. Wainwright,* 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Enmund v. Florida*, 458 U.S. 782 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Ford v. Wainwright*, 477 U.S. 399 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Fry v. Pliler*, 551 U.S. 112 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 101

*Hall v. Florida*, 134 S. Ct. 1986 (2014) . . . . . . . . . . . . . . . . . . . . . 13, 19, 26, 28, 32

*Harris v. Oklahoma*, 552 U.S. 1286 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lockett v. Ohio*, 438 U.S. 586 (1978) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Mills v. Maryland*, 486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 80

*Moore v. Texas*, 137 S. Ct. 1039 (2017) . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 37, 38

*Payne v. Tennessee*, 501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Penry v. Lynaugh*, 492 U.S. 302 (1989) .. . . . . . . . . . . . . . . . . . . . . . 23, 36, 73, 103

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 57

*Schriro v. Landrigan*, 550 U.S. 465 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Sears v. Upton*, 561 U.S. 945 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Skipper v. South Carolina*, 476 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Smith v. Texas*, 550 U.S. 297 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . 15-17, 22, 57, 58, 71

*Taylor v. Kentucky*, 436 U.S. 478 (1978) .. . . . . . . . . . . . . . . . . . . . . . . . . . 102, 103

*Tennard v. Dretke*, 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*Townsend v. Sain*, 372 U.S. 293, 312 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . 16, 17, 49, 50, 57, 69, 74

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . 28, 42, 43, 50, 56, 65, 66

*Woodson v. North Carolina*, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . 69, 82, 106

*Zant v. Stephens*, 462 U.S. 862 (1983) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

## CIRCUIT COURT CASES

*Allen v. Buss*, 558 F.3d 657 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Allen v. Mullin*, 368 F.3d 1220 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Anderson v. Attorney Gen. of Kansas*, 425 F.3d 853 (10th Cir. 2005) . . . . . . . . . 72

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . 17, 28

*Bryan v. Mullin*, 335 F.3d 1207 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Burgess v. Comm'r, Alabama Dep;t. of Corr.*, 723 F.3d 1308 (11th Cir. 2013) .. . 25

*Byrd v. Workman*, 645 F.3d 1159 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 52

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . 11, 102, 104

*Coleman v. Brown*, 802 F.2d 1227 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . 98

*DeLozier v. Sirmons*, 531 F.3d 1306 (10th Cir. 2008) .. . . . . . . . . . . . . . . . . . . . . 64

*DeRosa v. Workman*, 679 F.3d 1196 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . 89

*DeRosa v. Workman*, 696 F.3d 1302(Mem) (Lucero, J., dissenting) . . . . . . . . . . 99

*Dodd v. Trammell*, 753 F.3d 971 (10th Cir. 2013) . . . . . . . . . . . . . . 86, 89, 90, 101

*Ellis v. Hargett*, 302 F.3d 1182 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Fairchild v. Trammell*, 784 F.3d 702 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . 79

*Fairchild v. Workman*, 579 F.3d 1134 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 89

*Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 68, 69

*Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002) .. . . . . . . . . . . . . . . . . . 18, 57, 59

*Gilson v. Sirmons*, 520 F.3d 1196 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Goodwin v. Oklahoma*, 923 F.2d 156 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 88

*Gordon v. Braxton*, 780 F.3d 196 (4th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . 21, 71

*Grant v. Royal*, 886 F.3d 874 (10th Cir. 2018) . . . . . . . . . . . . . . . . . . 79, 81, 83, 84

*Grant v. Trammell*, 727 F.3d 1006 (10th Cir. 2013) . . . . . . . . . . . . . . . . 89, 93, 105

*Hain v. Gibson*, 287 F.3d 1224 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 89, 99

*Hanson v. Sherrod*, 797 F.3d 810 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . 79, 80, 83

*Hooks v. Workman*, 606 F.3d 715 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) . . . . . . . . . . . . . . . . . 16, 32, 33

*Hooper v. Mullin*, 314 F.3d 1162 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 89, 93

*Johnson v. Sec'y, Dep't. of Corr.,* 643 F.3d 907 (11th Cir. 2011) . . . . . . . . . . . . . 59

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . 18, 66

*Littlejohn v. Royal*, 875 F.3d 548 (10th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . 66

*Lockett v. Trammell*, 711 F.3d 1218 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . 89

*Lott v. Trammell*, 705 F.3d 1167 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Miller v. Champion*, 161 F.3d 1249 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 70

*Paxton v. Ward*, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Romano v. Gibson*, 239 F.3d 156 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 106

*Saiz v. Ortiz*, 392 F.3d 1166 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sallahdin v. Gibson*, 275 F.3d 1211(10th Cir. 2002) .. . . . . . . . . . . . . . . . . . . . 70, 71

*Selsor v. Workman*, 644 F.3d 984 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . 89, 93, 94

*Sharp v. Rohling,* 793 F.3d 1216 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . 51

*Smith v. Duckworth*, 824 F.3d 1233 (10th Cir. 2016) . . . . . . . . . . . . . . . . . . . 32, 34

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . 28, 42, 60, 61, 63

*Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 105

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . 103

*Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 62

*Welch v. Sirmons*, 451 F.3d 675 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 89

*Welch v. Workman*, 639 F.3d 980 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 89

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . 17, 70

*Willingham v. Mullin*, 296 F.3d 917 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 89

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . 103

*Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 103

## **<u>FEDERAL STATUTES</u>**

28 U.S.C. § 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2254(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82, 102

28 U.S.C. § 2254(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 55, 82

28 U.S.C. § 2254(d)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

28 U.S.C. § 2254(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

## **STATE COURT CASES**

*Blonner v. State*, 127 P.3d 1135 (Okla. Crim. App. 2006) . . . . . . . . . . . . 22, 30, 37

*Bosse v. State*, 400 P.3d 834 (Okla. Crim. App. 2017) . . . . . . . . . . . . . . . . . . . . . 89

*Cuesta-Rodriguez v. State*, 241 P.3d 214 (Okla. Crim. App. 2010) . . . . . . . . . . . 85

*DeRosa v. State*, 89 P.3d 1124 (Okla. Crim. App. 2004) . . . . . . . . . . . . . . . . . . 87

*Dodd v. State*, 100 P.3d 1017 (Okla. Crim. App. 2004) . . . . . . . . . . . . . . 91, 92, 93

*Harmon v. State*, 248 P.3d 918 (Okla. Crim. App. 2011) . . . . . . . . . . . . . . . . . . 85

*Harris v. State*, 84 P.3d 731 (Okla. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . 4, 14

*Harris v. State*, 164 P.3d 1103 (Okla. Crim. App. 2007) . . . 4, 20-23, 29, 30, 34, 38,

47, 49, 50, 55, 57, 59, 61, 69, 77, 78, 80, 82, 87, 88, 91, 92, 94, 102, 104

*Harris v. State*, 167 P.3d 438 (Okla. Crim. App. 2007) . . . . . . . . . . . . . . 5, 88, 102

*Lambert v. State*, 126 P.3d 646 (Okla. Crim. App. 2005) . . . . . . . . . . . . . . . . . . 41

*Martinez v. State*, 80 P.3d 142 (Okla. Crim. App. 2003) . . . . . . . . . . . . . . . . . . . 25

*Murphy v. State*, 54 P.3d 556 (Okla. Crim. App. 2002) . . . . . . . . . . . . . . 14, 29, 37

*Pickens v. State*, 126 P.3d 612 (Okla. Crim. App. 2005) . . . . . . . . . . . . . . . . . . . 25

*Simpson v. State*, 230 P.3d 888 (Okla. Crim. App. 2010) . . . . . . . . . . . . . . . . . . 85

*Snow v. State*, 87 P.3d 626 (Okla. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . . . 25

## STATE STATUTES

Okla. Stat. tit. 12, § 2403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Okla. Stat. tit. 21, § 701.10b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

Okla. Stat. tit. 21, § 701.10b(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Okla. Stat. tit. 21, § 701.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94, 99

## OTHER AUTHORITIES

AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* (10th ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, reprinted in 31 Hofstra Law Review 913 (rev. ed. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 66

AAIDD, *User's Guide: Mental Retardation, Definition, Classification and Systems of Supports* at 20-21 (10th ed. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Casey P. Johnson, et al, *Brain Abnormalities in Bipolar Disorder Detected by Quantitative T1p Mapping,* Molecular Psychiatry (Feb. 2015) . . . . . . . . . . 44

James R. Patton & Denis W. Keyes, *Death Penalty Issues Following Atkins*, 14 Exceptionality 237, 238 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Kevin S. McGrew, *Norm Obsolescence: The Flynn Effect,* in *The Death Penalty and Intellectual Disability* 155, 158 (Edward Polloway, ed., 2015) . . . . . . . . . . 35

Scott Phillips*, Status Disparities in the Capital of Capital Punishment*, 43 Law and Society Review 807 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95, 96

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Columbia Law Review 1538 (Oct. 1998) . . . . . . . . . . . . . . . . . 61

Stephen Strakowski, et al., *The functional neuroanatomy of bipolar disorder: a review of neuroimaging findings*, Molecular Psychiatry (Feb. 2005) . . . . 44

## PRIOR OR RELATED APPEALS

There are no prior or related appeals to this Court.

## JURISDICTION

Harris invoked the jurisdiction of the district court pursuant to 28 U.S.C. § 2254 by timely filing his Petition on March 3, 2009. Doc. 32. The district court denied relief in its Memorandum Opinion of April 19, 2017, and issued judgment for Respondent. Docs. 77, 78. *See* Attachment 1. The district court denied a certificate of appealability as to all grounds. Doc. 79. Judge Murphy, however, granted a certificate of appealability on five grounds from Petitioner's Request for a Certificate of Appealability. *See* Order filed January 5, 2018; Order of Clarification filed January 12, 2018. The jurisdiction of this Court is properly invoked pursuant to 28 U.S.C. § 2253 and Fed. R. App. P. 4(a).

## STATEMENT OF THE ISSUES

The district court erred in denying relief or an evidentiary hearing on the following constitutional claims:

1. Harris was denied effective assistance of trial counsel when counsel failed to investigate and present Harris's intellectual disability as a bar to execution under *Atkins v. Virginia*.

2. Harris was denied effective assistance of trial counsel when counsel failed to investigate, develop, and present mitigating evidence of Harris's mental illness.

3.  The jury instruction defining mitigating circumstances was impermissibly limiting, and prosecutors exploited the instruction to blunt jury consideration of Harris's mitigating evidence, all in violation of the Sixth, Eighth, and Fourteenth Amendments.

4.  The admission of unconstitutional victim-impact testimony, including requests for a death sentence, violated Harris's right to due process.

5.  The cumulative effect of otherwise harmless or non-prejudicial errors deprived Harris of a fair trial.

## PRELIMINARY STATEMENT

References to transcripts, records, and exhibits will be as follows: Harris's 2001 trial will be referenced as "2001 Tr." followed by volume and page; his 2005 resentencing trial will be referenced as "2005 Tr." followed by volume and page. Motion hearing transcripts will be "M.Tr." followed by date. The 2001 competency trial will be referenced as "Comp.Tr." followed by volume and page.  The original record will be noted as "O.R." followed by the page.  Trial exhibits will be "Def. Ex. #," or "St. Ex. #."  Harris's Application for Post-Conviction Relief will be "APCR" followed by page. References to the federal district court pleadings will be referred as "Doc. #" followed by page.  Attachments to this brief shall be designated "Attachment" followed by corresponding number.

2

## STATEMENT OF THE CASE

On September 8, 1999, Petitioner, Jimmy Dean Harris, was charged with the following counts in Oklahoma County, No. CF-99-5071: 1) First Degree Murder (malice aforethought); 2) Shooting with Intent to Kill; and 3) Assault and Battery with a Dangerous Weapon. O.R. 1-5, occurring September 1, 1999.

On October 4, 1999, Harris was declared incompetent and was sent to Eastern State Hospital in Vinita, Oklahoma for treatment. O.R. 15-16. On April 6, 2000, Harris was found competent and the proceedings resumed. O.R. 34-35.

On May 12, 2000, the State filed a Bill or Particulars alleging the following aggravating circumstances: 1) During the commission of the murder, the defendant knowingly created a great risk of death to more than one person; and 2) At the present time there exists a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. O.R. 41-42.

On April 11-13, 2001, a bench trial was held on Harris's competency. The trial court found Harris competent but mentally ill and in need of medication to remain competent. O.R. 691-93. On June 5, 2001, Harris was again sent to Eastern State Hospital for treatment. O.R. 810-11. Following treatment, Harris was found competent to stand trial on July 18, 2001. O.R. 888-89.

Harris was tried by a jury before the Honorable Virgil Black in August and

September, 2001. The jury found Harris guilty of all three counts and assessed punishment at death on Count One, life imprisonment on Count Two, and ten years imprisonment on Count Three – the maximum for each offense. O.R. 1207-1210. The jury rejected the continuing threat aggravator, finding only the great risk of death aggravator. O.R. 1191, 1211. Judge Black imposed sentencing in accordance with the jury's verdicts. O.R. 1191-94.

On Harris's first direct appeal (D-2001-1268), the Oklahoma Court of Criminal Appeals ("OCCA") affirmed Harris's convictions but reversed and remanded his death sentence for resentencing based on the trial judge's impermissible response to a jury question. *Harris v. State*, 84 P.3d 731, 757 (Okla. Crim. App. 2004). *See* Attachment 2.

Harris's resentencing trial was held in January 2005. The State was represented by Oklahoma County District Attorney Wes Lane and Assistant Pattye High. Harris was represented by James Rowan. The State alleged the same two aggravating circumstances. Finding the existence of both aggravating circumstances, the jury again sentenced Harris to death. O.R. 1592-94. The trial court sentenced Harris to death on February 3, 2005. O.R. 1636-1639.

On his second direct appeal, D-2005-117, the OCCA affirmed Harris's sentence in *Harris v. State*, 164 P.3d 1103 (Okla. Crim. App. 2007). *See* Attachment

4

3. The Supreme Court denied certiorari. *Harris v. Oklahoma*, 552 U.S. 1286 (2008).

Harris sought state collateral relief, PCD-2005-665. The OCCA denied Harris's Application for Post-Conviction Relief ("APCR") and Motion for an Evidentiary Hearing in *Harris v. State*, 167 P.3d 438 (Okla. Crim. App. 2007). *See* Attachment 4.

Harris timely filed his Petition for Writ of Habeas Corpus. Doc. 32. The district court denied habeas relief, discovery, an evidentiary hearing, and a certificate of appealability. Docs. 77-80. This appeal was timely commenced. Doc. 81.

## STATEMENT OF FACTS

On September 1, 1999, Harris entered into the workplace of his wife, Pamela Harris, shot and wounded her, and shot and killed her boss, Merle Taylor. The incident arose from on ongoing divorce and property dispute, which had reached its peak after Pam locked up Harris's tools of the trade. 2001 Tr. Vol. 7 at 67-69.

Pam and Harris had been involved in a tumultuous relationship for about 20 years and married for the last ten. 2005 Tr. Vol. 3 at 487-88. During their relationship, the Harrises worked together as a team in the transmission-repair business. Harris was known as the "transmission "rebuilder," while Pam was known as the customer-service manager. *Id.* at 501-02.  Pam routinely provided assistance to Harris who "was slow and . . . had to do things very slowly and with help." 2005

5

Tr. Vol. 5 at 58. She often called hotlines for assistance, read the technical manuals, and relayed the information to Harris. *Id.* at 55-56, 157.

Although the Harrises were able to work as a team, there was discord. Pam's stepfather, Leo Prehara, testified there were difficulties between the Harrises over the years, but described these as not even "arguments," but rather, "more yeah-yeahing each other." 2005 Tr. Vol. 3 at 605. Prehara knew of no physical abuse, nor did he believe Harris was a violent person. *Id.* at 607, 609. Ronnie Weiss, a former employer of the Harrises, described their relationship as "verbally combative," 2005 Tr. Vol. 5 at 157, and he noted Pam "customarily berated" Harris. *Id.* at 160. Roland Vasquez, a former co-worker of the Harrises, described their relationship as bickering like "cats and dogs," with Pam getting in the most words. *Id.* at 164-65. Pam testified Harris had been verbally and physically abusive to her over the course of their relationship. 2005 Tr. Vol. 3 at 490-92, 497-500, 506-10, 524-33.  Dr. Draper, a developmental psychologist, described their relationship as "convoluted." 2005 Tr. Vol. 5 at 56.

This "convoluted" relationship took a turn for the worse in 1998, when the couple moved back to Oklahoma looking for work. 2005 Tr. Vol.3 at 513. Unable to find a job in Oklahoma, Harris accepted a job near Dallas. He worked there during the week and returned to the family home on weekends. *Id*. at 514. Meanwhile, Pam took a job working for Merle Taylor, the owner of an AAMCO Transmission in

Oklahoma City. *Id*. at 517. Harris asked Pam if she could get him a job at the shop, but Mr. Taylor did not need any additional help. *Id.* at 519. The long-distance relationship took a toll on their already-strained marriage. *Id.* at 514-15.

In late 1998, Harris was injured and hospitalized. He returned to the family home unemployed. *Id.* at 515-17. He occasionally did transmission work in the garage. *Id.* at 523. When not working, Harris spent his time drinking, smoking marijuana, and talking with his father about "try[ing] . . . to get something going on."[1] *Id.* at 522.

On August 15, 1999, after an argument with Harris, Pam left with their daughter, Kristina, and went to Pam's parents. *Id.* at 524; 2001 Tr. Vol. 7 at 107-08; 112-13. Pam called Harris and told him she was filing for divorce and threatened to force Harris out if he refused to leave the house. 2001 Tr. Vol. 14 at 9, 12-14.  Mr. and Mrs. Harris sought victim-protective orders ("VPO") against each other. 2005 Tr. Vol. 3 at 523-39; 2001 Tr. Vol. 7 at 155-66, 160. Pam also filed for divorce from Harris. Ultimately, on August 25, 1999, Pam's VPO and her divorce from Harris were granted, and Harris was directed to leave the family home by the following morning.[2]

---

[1] Harris's father, Jimmy Lee Harris, was also in the transmission business. 2005 Tr. Vol. 3 at 489.

[2] Harris was intoxicated and appeared pro se at the hearing on August 25, 1999. 2001 Tr. Vol. 14 at 30-32.

2005 Tr. Vol. 3 at 538-40; St. Ex. 11. Between the time the divorce was petitioned and the time it was granted, the Harrises discussed how to divide their property. *Id.* at 542. Harris tape recorded these conversations.

On the evening of August 25, 1999, Harris, along with his father, brother, nephew, and daughter, moved his belongings from the home into a storage shed. 2005 Tr. Vol. 5 at 189-90, 192, 201-03, 206. Among the items moved into the shed were Harris's specialized tools for transmission work. Witnesses described the quantity of tools as "a ton," requiring a flatbed trailer to move them.[3] *Id.* at 192, 206.  They were careful to remove only those things which Pam had said Harris could have. *Id.* at 189-90, 203-04. As the family worked to remove Harris's property, Harris mostly stayed inside, crying, getting drunk, and consuming Valium.[4] *Id.* at 190, 205-06, 213. At the end of the evening, Harris was left alone in the house. *Id.* at 205.

The following evening, Mrs. Harris returned to the home; the house keys had been broken off inside the door locks, requiring her to break down a door to regain entry. Harris had vandalized the home, removing most furnishings, destroying her clothing, burning holes in the carpet, and writing "Miss AAMCO" on the carpet with

---

[3] Harris was planning on taking his tools to Texas to work with his father. 2005 Tr. Vol. 5 at 192.

[4] Harris has had a life-long addiction to Valium, beginning when he was a young teenager and given to him by his father. 2005 Tr. Vol. 5 at 63, 86.

barbeque sauce. 2005 Tr. Vol. 3 at 545-55. She later discovered some of her belongings had been moved into the storage shed where Harris's belongings were stored. As a result, she obtained an order permitting her to change the locks on the storage shed, denying Harris access to his tools. *Id.* at 558-59.

Between August 26 and September 1, Harris called Pam numerous times, begging her to unlock the storage shed so he could get his tools back; she told him to contact her attorney. 2005 Tr. Vol. 3 at 560-62. Finally, on September 1, 1999, after a flurry of phone calls to Mrs. Harris at the AAMCO shop and after a morning of drinking and taking Valium, Harris walked into the AAMCO shop and shot Mrs. Harris and Mr. Taylor. Mr. Taylor died at the scene.

## SUMMARY OF THE ARGUMENT

Mr. Harris, an intellectually disabled man, stands to be executed without this Court's intervention. Although Harris scored below 70 on three tests for intellectual functioning and exhibited deficits in several areas of adaptive functioning, his attorney never hired an appropriate expert to assess Harris's intellectual functioning or apply contemporary clinical standards to Harris's prior intellectual functioning testing. Because of trial counsel's investigative failures and the unreasonable decision of the OCCA, Harris has never been given the Constitutional protection to which he is entitled, nor has he even been afforded an *Atkins* hearing.

What is more, due to trial counsel's ineffectiveness, the jury that sentenced Harris to death did so without hearing the most critical mitigating evidence. Despite myriad evidence demonstrating his serious mental illness, including bipolar II disorder, and demonstrating Harris's amenability to treatment, trial counsel failed to hire an appropriate expert and present such evidence. Harris's debilitating mental health disorder resulted in his having impaired cognitive abilities at the time of the shooting. Such failures left Harris's second-stage case vulnerable to the prosecution's unsubstantiated claims that Harris was a malingerer and to the alleged continuing threat aggravator. Harris's defense against the death penalty fell well below the requirements of the Sixth Amendment.

Further compounding the unfairness and unreliability of the sentencing process, the prosecution exploited an infirm jury instruction to argue *all* of Harris's mitigating evidence was irrelevant because it did not fit the skewed definition the prosecution recited as law. According to Prosecutor High, none of Harris's mitigation reduced his "moral culpability;" thus, the jurors were not to consider it.

And finally, the prosecution, despite being on notice about the unconstitutionality of requests for death from a victim's family, opted to present such testimony from Mr. Taylor's wife and son, both of whom requested death on behalf of their entire family. The prosecution injected this clear constitutional error with no

purpose other than to inflame the prejudice of jurors.

Thus, in the end, Mr. Harris did not receive a sentencing proceeding worthy of confidence, particularly when the prejudicial effect from these separate errors is aggregated. The death sentence is unreliable. Relief should have been granted.

## <u>STANDARD OF REVIEW</u>

This Court reviews legal determinations of a district court de novo and factual determinations for clear error.  This Court's review is additionally governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  Under the AEDPA, when a state court has considered a claim on the merits, this Court will reverse only if the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).  This Court's de novo review of the district court's legal analysis of the state court decision permits rebuttal of any factual findings.  *Saiz v. Ortiz*, 392 F.3d 1166, 1176 (10th Cir. 2004).

When a state court has not considered a claim on the merits, this Court "is not constrained by the deference principles in § 2254(d)" and reviews the district court's legal decisions de novo and factual findings for clear error. *Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003); *Allen v. Mullin*, 368 F.3d 1220, 1234 (10th Cir.

11

2004). Where a district court has not conducted an evidentiary hearing and has before it only those facts developed in the state court, this Court independently reviews the same. *Allen*, 368 F.3d at 1234.

## PROPOSITION ONE

**HARRIS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT HIS 2005 PENALTY RETRIAL WHEN COUNSEL FAILED TO INVESTIGATE AND PRESENT HARRIS'S INTELLECTUAL DISABILITY AS A BAR TO ELIGIBILITY FOR EXECUTION UNDER *ATKINS v. VIRGINIA*.**

**A.      Where the Claim Was Raised.**

This claim was raised in Ground Seven of Harris's habeas petition, Doc. 32 at  74-130  and in his Motion for Evidentiary Hearing, Doc. 33 at 4-5. The district court denied relief. Doc.77 at 32-37.

**B.      Arguments and Authorities.**

**1.      Introduction.**

Harris was tried, convicted, and sentenced to death in September of 2001 after having been found competent in April of 2001. Extensive lay and expert testimony of Harris's limited mental functioning was presented at both trials, including evidence he was found to be intellectually impaired as a child and on IQ tests after the homicide. Comp.Tr. Vol. 1 at 58, 65, 66, 119; 2001 Tr. Vol. 13 at 102; 2001 Tr. Vol. 15 at 121-22, 152, 206-07. He struggled academically, relied on tutors and special education, and did not finish high school; he does not read or write well, and

he lacks comprehension skills. 2001 Tr. Vol. 11 at 85-87; 2001 Tr. Vol. 12 at 27-68, 123, 149; 2001 Tr. Vol. 15 at 7; 2001 Tr. 16 at 125. The evidence of Harris's limited mental functioning was included as a mitigating factor at his 2001 trial. O.R. 1257.

After Harris's original trial, the Supreme Court banned execution of the intellectually disabled and found such executions were prohibited by the Eighth Amendment. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).[5] Post *Atkins*, the OCCA adopted the following definition for mental retardation to be applied to those defendants claiming death ineligibility under *Atkins*:

> A person is "mentally retarded": (1) If he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.

> . . . [N]o person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test.

---

[5] When the Supreme Court rendered its opinion in *Atkins*, it employed the term "mental retardation." The Court now uses the term "intellectual disability" to describe the identical condition. *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

*Murphy v. State*, 54 P.3d 556, 567-68 (Okla. Crim. App. 2002), *overruled on other grounds by Blonner v. State*, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006).

The *Murphy* definition of mental retardation tracked the definitions of the two most preeminent clinical organizations: the American Psychiatric Association ("APA") and the American Association on Mental Retardation ("AAMR").[6] *Murphy*, 54 P.3d at 566 n.13. The Supreme Court relied on the definitions promulgated by both organizations to emphasize the clinical underpinnings of the *Atkins* constitutional restriction. *Atkins*, 536 U.S. at 308 n.3; *see also id.* at 317 n.22.

Direct-appeal counsel included an *Atkins* claim within Harris's direct-appeal brief. *See Harris v. State, Brief of Appellant*, D-2001-1268 at 88-93 (Okla. Crim. App. Mar. 6, 2003). Counsel also filed an application for remand for a hearing on Harris's *Atkins/Murphy* status. *See Harris v. State*, *Application for Remand to the District Court*, D-2001-1268 (Okla. Crim. App. Nov. 20, 2002). Ultimately, the OCCA granted sentencing relief on an unrelated jury-question issue and remanded the case for a resentencing trial, leaving the question of Harris's *Atkins* status unresolved. *Harris,* 84 P.3d at 757 & n.21.

---

[6] The AAMR is now known as the American Association on Intellectual and Developmental Disabilities ("AAIDD").

14

Despite the Supreme Court's directive, Harris's resentencing trial counsel failed to pursue, investigate, and present an *Atkins* defense, notwithstanding there was plenty of developed evidence to meet at least a prima facie case under the *Murphy* standard. Specifically, Harris had been given three separate IQ tests, scoring below 70 on all three tests. *See* Doc. 32, Ex. 2 (report of Dr. Nelda Ferguson reflecting diagnosis of "Mental Retardation - Mild" based on the Wechsler Adult Intelligence Scale ("WAIS")-III administered on October 20, 2000, resulting in full-scale score of 63); Doc. 32, Ex. 3 (report of Dr. Martin Krimsky classifying Harris as falling in mild mental retardation range based on the Slosson Intelligence Test-Revised ("SIT-R") administered on March 8, 2001, resulting in full-scale IQ score of 66 and based on WAIS-R administered on March 21, 2001, resulting in full-scale IQ score of 68).

By failing to investigate and present an *Atkins* defense, trial counsel performed deficiently to the prejudice of his client, thereby rendering ineffective assistance of counsel in violation of Harris's Sixth, Eighth, and Fourteenth Amendment rights. *Strickland v. Washington*, 466 U.S. 668 (1984). The district court erred by finding the OCCA's determination of no prejudice neither contrary to nor an unreasonable application of clearly established federal law or an unreasonable determination of facts. Doc. 77 at 37.

## 2.     Trial Counsel Performed Deficiently.

Neither the OCCA nor the district court made a finding regarding the deficient-performance prong of *Strickland*. Doc. 77 at 33, 37. As a result, this Court is not constrained by AEDPA principles and review is de novo. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("[b]ecause the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim de novo.").

 "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. "[T]he standards for capital defense work articulated by the American Bar Association (ABA) [are] standards to which [the Supreme Court has] long referred as 'guides to determining what is reasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466 U.S. at 688). Likewise, this Court looks to these guidelines as "reference points" in judging whether counsel's performance is reasonable under prevailing professional norms. *See Hooks v. Workman*, 689 F.3d 1148, 1201 (10th Cir. 2012).

At the time of Harris's resentencing, the ABA's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases required counsel "to conduct thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guideline 10.7, reprinted in 31 Hofstra L. Rev. 913,

1015 (rev. ed. Feb. 2003). ABA Guideline 10.8(A) obligated trial counsel to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted." *Id.* at 1028. And finally, ABA Guideline 10.11(L) required "[c]ounsel at every stage of the case [to] take advantage of *all* appropriate opportunities to argue why death is not [a] suitable punishment for their particular client." *Id.* at 1058 (emphasis added). In derogation of these guidelines, trial counsel failed to investigate and present an *Atkins* defense to Harris's death eligibility.

This Court has long noted counsel's duties must be "strictly observed" in capital cases. *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997). Although trial counsel's decision-making is afforded great deference, *see Hooks v. Workman*, 606 F.3d 715, 723 (10th Cir. 2010), the failure to thoroughly investigate mitigation or a line of defense can constitute deficient performance, *see Anderson v. Sirmons*, 476 F.3d 1131, 1145 (10th Cir. 2007). Moreover, although "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690, the question is not whether trial counsel made a strategic decision not to present evidence, but rather whether "the investigation supporting counsel's decision . . . was *itself reasonable*." *Anderson*, 476 F.3d at 1145 (quoting *Wiggins,* 539 U.S. at 523). "[T]he mere incantation of strategy

does not insulate attorney behavior from review." *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002).

In the face of substantial evidence of Harris's limited intellectual functioning, trial counsel failed to engage the services of anyone with expertise in intellectual disability or IQ measurement. Instead, trial counsel retained the services of Dr. Wanda Draper, a "developmental specialist" with a doctorate in "development" to present a "developmental life path" to the jury. 2005 Tr. Vol. 5 at 28, 35. According to Dr. Draper's own admission, she dealt only with Harris's "development;" she was "not really the person" who dealt with his psychiatric or psychological problems. *Id.* at 129.

In the ten years leading up to Harris's resentencing, Rowan hired Dr. Draper "[p]robably at least 12 or 15 times." 2005 Tr. Vol. 5 at 74. In one of those cases, this Court was concerned Rowan may have performed deficiently by relying on Draper to provide a socio-developmental history, like the one she prepared in Harris's case, when there were "red flags" in the record substantiating the need for a psychiatrist or an expert in brain-based mental health issues. *Littlejohn v. Trammell*, 704 F.3d 817, 860-63, 867-68 (10th Cir. 2013).

Recognizing the strength of the intellectual disability evidence in the record, direct-appeal counsel, retained an appropriate expert to investigate Harris's

18

intellectual disability and prior IQ testing. In support of Harris's *Application for Evidentiary Hearing*, D-2005-117 (Okla. Crim. App. May18, 2006), direct-appeal counsel attached the report of Dr. Jennifer Callahan, a licensed clinical psychologist. Ex. A-2; Doc. 32, Ex. 1. Applying contemporary clinical standards, Dr. Callahan concluded Harris's IQ falls within the 67-75 range[7] and his general intellectual abilities are "approximately equivalent to . . . a 6 year, 10 month old child, with broad discrepancies in the underlying abilities." Ex. A-2 at 7.

Based on the record below, there is nothing to support a determination that trial counsel made a strategic decision after a reasonable investigation to abandon a defense to death eligibility under *Atkins*, especially under de novo review. Trial counsel's failure to adequately investigate and present an *Atkins* defense constitutes deficient performance.

### 3. The District Court Erred by Endorsing the OCCA's Prejudice Determination.

Without a hearing, the OCCA made the following prejudice determination:

Nothing in this record shows that, had counsel made that request [for a pretrial determination of Mr. Harris's *Atkins* status], evidence would have shown by a preponderance of the evidence that Harris was mentally

---

[7] The Supreme Court has found clinical practices mandate consideration of the standard error of measurement ("SEM"). *Hall v. Florida*, 134 S. Ct. 1986, 1995, 2000 (2014).The generally accepted SEM adjustment for assessing intellectual disability is plus or minus five points. *Id.* at 1998.

> retarded. There is a great deal of evidence in the record to show otherwise, including the opinion of several experts who testified that Harris was not mentally retarded. We cannot conclude there was a reasonable probability that, but for counsel's omission, the results of this resentencing proceeding would have been different.

*Harris*, 164 P.3d at 1116. Because the OCCA denied this claim without a hearing on

Harris's *Application for Evidentiary Hearing on Sixth Amendment Claims* and

thwarted further factual development in support of the claim, the OCCA failed to

adjudicate this claim on the merits, and this portion of the claim should be reviewed

de novo.

Not only did Dr. Callahan conclude Harris's IQ falls in the 67-75 range, she

also applied contemporary, scientific methods to Harris's former testing results to

highlight the consistency in Harris's scores. Doc. 32, Ex. 1. Nowhere in the OCCA's

disposition of this particular claim did the court address the extra-record evidence of

Dr. Callahan's report. *Harris*, 164 P.3d at 1114-16.

Further engagement by the OCCA was essential to an adjudication on the

merits. As the Fourth Circuit has stated

> A claim is not "adjudicated on the merits" when the state court makes its decision "on a materially incomplete record." A record may be materially incomplete "when a state court unreasonably refuses to permit 'further development of the facts' of a claim." In this circumstance, we do not offend the principles of "comity, finality, and federalism" that animate AEDPA deference because the state court has "passed on the opportunity to adjudicate [the] claim on a complete record."

*Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) (citations omitted). *See also Milke v. Ryan*, 711 F.3d 998, 1007 (9th Cir. 2013) The OCCA's cursory treatment does not constitute an adjudication entitled to § 2254(d) protection.

But even if this Court finds the prejudice determination is subject to § 2254 review, such was based on both an unreasonable application of *Atkins* and *Strickland,* and was premised on an unreasonable determination of facts. 28 U.S.C. § 2254(d)(1)-(2). Thus, the district court erred by endorsing the OCCA's finding of no prejudice. Doc. 77 at 37.

Most obviously, the OCCA premised its decision of no prejudice on an unreasonable determination of fact by concluding "[a]ll Harris's experts, including the ones who testified at his competency hearing . . . concluded he was not mentally retarded." *Harris,* 164 P.3d at 1115. The record of the competency trial belies this statement. Specifically, Dr. Martin Krimsky, a clinical psychologist with experience conducting competency evaluations "of individuals with mental retardation," Comp.Tr. Vol. 1 at 38, concluded Harris suffers from "mild mental retardation." *Id.* at 58. *See also id.* at 65 (clarifying Harris is "not borderline," but rather suffers from "mild mental retardation"); *id.* at 66 (maintaining that Harris "is retarded" and "is an individual with mental retardation"). Undoubtedly, the OCCA's determination that "all of Harris's experts . . . concluded he was not mentally retarded" is unreasonable,

thereby triggering review under §2254(d)(2).

Further, the OCCA acted contrary to and unreasonably applied *Strickland* by holding Harris to a higher prejudice standard than the reasonable-probability standard required by *Strickland*. Although the OCCA initially referenced the correct reasonable-probability standard for prejudice, *Harris*, 164 P.3d at 1114, it contradicted this standard by later "review[ing] the record to see whether, had counsel requested a hearing, Harris would have prevailed on his claim of mental retardation," *id.* at 1115. The OCCA unreasonably raised the prejudice standard far beyond a probability sufficient to undermine confidence in the outcome, which is *all* that is required by *Strickland*, 466 U.S. at 694. But even if this Court determines the OCCA did not apply a prejudice standard contrary to *Strickland*, Harris will establish below that had trial counsel properly investigated and presented an *Atkins* defense, there exists a reasonable probability at least one juror would have found him mentally retarded. *See Blonner v. State*, 127 P.3d 1135, 1142 (Okla. Crim. App. 2006) (requiring unanimous verdict and directing trial courts to strike bill of particulars and enter an order finding defendant to be mentally retarded when jury cannot reach a unanimous verdict). *See Harris*, 164 P.3d at 1115 nn.51, 52 (applying *Blonner*).

Further, the OCCA's reliance on evidence presented in proceedings that occurred *before* the Supreme Court's *Atkins* decision to support its finding of no

prejudice was unreasonable and contrary to clearly established federal law. Both the OCCA and the district court emphasized evidence presented in previous proceedings to determine Harris would not have prevailed on an *Atkins* claim had his trial counsel pursued one. *See Harris*, 164 P.3d at 1115 (concluding "[a]ll the evidence in the record, including the evidence from the first trial and competency hearing, indicates that Harris could not meet [the *Murphy*] test"); Doc. 77 at 36-37. Neither the competency hearing nor the original trial focused on the proper inquiry: whether Harris can establish by a preponderance of the evidence he is intellectually disabled.[8] Hence, due to trial counsel's failures and the OCCA's unreasonable decision, Harris has never had a full and fair opportunity to present evidence of his intellectual disability in the *Atkins* context.

In *Bobby v. Bies*, 556 U.S. 825, 835-36 (2009), the Court, while addressing the intersection of the Double Jeopardy Clause and *Atkins* determinations, underscored the importance of making *Atkins* determinations based on post-*Atkins* hearings focused only on the intellectual-disability issue. Ultimately, the Court concluded a subsequent hearing on whether the petitioner qualified as mentally retarded under *Atkins* would not twice put him in jeopardy after a jury had previously given weight to his mental retardation as a mitigating factor under *Penry v. Lynaugh*, 492 U.S. 302

---

[8] The same can be said about the 2005 post-*Atkins* resentencing.

23

(1989). In coming to this conclusion, the Court held mental retardation as a mitigator and mental retardation under *Atkins* "are discrete legal issues." *Bobby*, 556 U.S. at 836. And because no state court had found the defendant mentally retarded (or not mentally retarded) under the state-created definition pursuant to *Atkins*' guidance, the issue of whether he was eligible for *Atkins* protection was not subject to issue preclusion. *See also Brumfield v. Cain*, 135 S. Ct. 2269, 2278-82 (2015) (noting contrary evidence of the petitioner's intellectual disability cannot foreclose all reasonable doubt as to the petitioner's intellectual disability; given that the evidence of the petitioner's intellectual disability was presented in a trial before *Atkins*, the state court should have taken into account the evidence was sought and introduced at a time when the petitioner's intellectual disability was not at issue).

In a related case, the Seventh Circuit held a petitioner was entitled to an *Atkins* hearing where the state's highest court relied on the trial court's pre-*Atkins* determination the petitioner's mental retardation was not sufficiently mitigating to overcome an aggravating circumstance. *Allen v. Buss*, 558 F.3d 657, 663 (7th Cir. 2009). This is what happened to Mr. Harris. In *Allen*, the Indiana Supreme Court concluded petitioner had received a "full and fair opportunity to litigate the issue of whether he is mentally retarded." *Id.* The Seventh Circuit disagreed, finding that neither the trial court nor the state supreme court had provided an opportunity for the

24

petitioner to prove whether he was, in fact, mentally retarded. *Id*. at 664. Ultimately, the Seventh Circuit held "the . . . determination that the trial court found [the petitioner] to be not mentally retarded for the purposes of *Atkins* is objectively unreasonable." *Id.* at 664. *See also Burgess v. Comm'r, Alabama Dep't. of Corr.*, 723 F.3d 1308, 1317 (11th Cir. 2013) (same). Here, the OCCA acted unreasonably and the district court erred by relying on evidence adduced at pre-*Atkins* proceedings, and even at the 2005 resentencing, because none of those proceedings provided Harris with a full and fair hearing on the issue of his *Atkins* eligibility.

At one time, it appeared the OCCA understood the necessity of providing a full and fair opportunity to litigate *Atkins* claims to those defendants "who have fairly raised the issue of mental retardation in previous proceedings to bring all their evidence together, and to supplement it where necessary." *Martinez v. State*, 80 P.3d 142, 144 (Okla. Crim. App. 2003); *see also Snow v. State*, 87 P.3d 626, 628 (Okla. Crim. App. 2004); *Pickens v. State*, 126 P.3d 612, 623 (Okla. Crim. App. 2005) (discussing remand for jury trial on *Atkins* issue where petitioner was "able to present his claim to jurors who were focused on the question at hand, i.e., whether Petitioner's mental retardation claim had substance and rendered him constitutionally ineligible for the death"). However, after determining *Atkins* and the Eighth Amendment require proceedings "focused on the question at hand" once a defendant

25

meets the threshold requirement of at least one IQ test below 70, the OCCA utterly

failed to extend the same opportunity to Harris. This too was unreasonable.

In determining prejudice, the OCCA disregarded clinical diagnostic definitions

and practices regarding intellectual disability and adopted its own I-know-it-when-I-

see-it approach, thereby applying *Atkins* unreasonably. In *Atkins*, the Court tasked the

states with "developing appropriate ways to enforce the constitutional restriction,"

which prohibits the execution of the intellectually disabled. *Atkins*, 536 U.S. at 317

(quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)). But *Atkins* did not give

the states "unfettered discretion to define the full scope of the constitutional

protection." *Hall*, 134 S. Ct. at 1998. "If the States were to have complete autonomy

to define intellectual disability as they wished, the Court's decision in *Atkins* could

become a nullity." *Id.* at 1999. States are limited to developing procedures to

vindicate substantive constitutional rights, not to impair them. *See Ford*, 477 U.S. at

416.

Without a doubt, "[t]he clinical definitions of intellectual disability . . . were

a fundamental premise of *Atkins*." *Hall*, 134 S. Ct. at 1999. The Supreme Court has

continued to emphasize the clinical underpinnings of the constitutional restriction.

For example, in *Hall*, by recognizing that "[i]ntellectual disability is a condition, not

a number," *id.* at 2001, the Court relied on clinical definitions and diagnostic

26

practices in finding Florida's IQ cutoff of 70 for intellectual disability claims was flatly unconstitutional. *Id.* at 2000 ("The legal determination of intellectual disability . . . is informed by the medical community's diagnostic framework"). Florida "disregarded established medical practice." *Id.* at 1995.

Likewise, in *Brumfield,* 135 S. Ct. at 2276-82, the Court emphasized clinical practices and criteria, ultimately finding the state court's rejection of the petitioner's request for an *Atkins* hearing was premised on an unreasonable determination of facts. In *Brumfield*, the state court, much like the OCCA in Harris's case, dismissed the petitioner's state post-conviction *Atkins* claim without holding an evidentiary hearing. *Id.* at 2275. The state court based its decision on evidence presented at the petitioner's pre-*Atkins* trial, which included evidence that the petitioner scored 75 on an IQ test and may have scored higher on another test. *Id.* at 2277. The state court further unreasonably concluded the record failed to raise a question as to the petitioner's impairments in adaptive skills, where the record indicated the petitioner had poor reading skills, behavioral problems, and slow development. *Id.* at 2279-81.

And most recently, in *Moore v. Texas*, 137 S. Ct. 1039, 1049-53 (2017), the Court again relied on prevailing clinical standards to conclude Texas's reliance on the non-clinical *Briseno* factors to assess adaptive functioning was unconstitutional. In addition to rejecting the non-clinical *Briseno* factors, the Court offered the following

guidance to lower courts: "In *Hall v. Florida*, we held that a State cannot refuse to entertain other evidence of intellectual disability when a defendant has an IQ score above 70." *Id.* at 1048. This is so because "[t]he medical community's current standards supply one constraint on States' leeway" in the area of defining intellectual disability for the purposes of *Atkins* protection. *Id.* at 1053.

*Hall, Brumfield,* and *Moore* did not announce a new constitutional rule; instead, they simply shed light on the proper interpretation and application of *Atkins.* *See Hall*, 134 S. Ct. at 1993 (finding "[t]he question this case presents is how intellectual disability must be defined in order to implement . . . the holding of *Atkins*"). In fact, these later cases' illumination of the *Atkins* constitutional restriction is no different than the Supreme Court's clarification of *Strickland* in *Williams v. Taylor*, 529 U.S. 362 (2000). And just as this Court applied *Williams* in cases with *Strickland* claims that were decided by the OCCA prior to *Williams*, so should it apply *Hall, Brumfield,* and *Moore* to cases with *Atkins* claims. *See Anderson,* 476 F.3d at 1144, 1146-47; *Smith v. Mullin*, 379 F.3d 919, 943 (10th Cir. 2004); *Ellis v. Hargett*, 302 F.3d 1182, 1187 (10th Cir. 2002).

In determining Harris failed to establish a reasonable probability he would have been successful had trial counsel requested an *Atkins/Murphy* pre-trial hearing, the OCCA failed to adhere to current clinical standards with respect to prongs one and

28

three of the *Murphy* definition: significant sub-average intellectual functioning and significant limitations in adaptive functioning in at least two of nine enumerated skill areas.[9]

As an initial matter, the OCCA's treatment of the distinct definitional prongs announced in *Murphy* (which mirrors the definition announced in *Atkins*) is muddy, and the analysis conflates adaptive functioning and intellectual functioning. *Harris*, 164 P.3d at 1115. This conflated analysis makes review more difficult, but it also serves to highlight the unreasonableness of the court's prejudice determination.

### i.    Significantly sub-average intellectual functioning.

With respect to the first *Murphy* prong – significant sub-average intellectual functioning – the OCCA unreasonably failed to apply contemporary clinical standards and unreasonably ignored Dr. Callahan's report presented in support of Harris's request for an evidentiary hearing when it minimized Harris's IQ scores under 70 but placed great emphasis on the scores above 70: "Despite these two IQ scores [of 66

_____

[9] Neither the OCCA nor Respondent addressed the age-of-onset prong from *Murphy*. *See Harris*, 164 P.3d at 1114-16; *State v. Harris*, D-2005-117, *Brief of Appellee* at 8-16, (Okla. Crim. App. July 25, 2006). In any event, the fact that Harris was characterized as a "slow" child while in school satisfies this prong. *Murphy*, 54 P.3d at 567. Other evidence in the record demonstrates Harris struggled in school, relied on tutors and special education, and dropped out of high school. 2001 Tr. Volumes 11 at 85-87; Vol. 12 at 123, 148-50; Vol. 15 at 7, 136, 140; 2005 Tr. Vol. 5 at 27-68, 173.

and 68 obtained before his original trial],[10] all Harris's other IQ scores were over 70. All Harris's experts, including the ones who testified at his first trial and competency hearing, considered these scores along with Harris's other characteristics and concluded he was not mentally retarded." *Harris,* 164 P.3d at 1115. The district court erred by endorsing the same. Doc. 77 at 36-37.

What both the OCCA and the district court unreasonably ignore is Harris, without a doubt, provided sufficient evidence to trigger a *Murphy* hearing with his three IQ tests scores below the threshold of 70. Doc. 32, Exs. 1, 2, 3. And the additional evidence presented in Dr. Callahan's report established, at a minimum, a reasonable probability at least one juror would have found Harris mentally retarded had his trial counsel properly investigated and sought *Atkins* protection for his client with an appropriate expert. *Blonner*, 127 P.3d at 1142.

Specifically, Dr. Callahan concluded Harris's IQ range is 67-75, as measured by the WAIS-III. Doc. 32, Ex. 1, A-2 at 6-7. Further, she found "Mr. Harris obtained consistent results during [her] evaluation, with no indication of variable effort or malingering." Doc. 32, Ex. 1, A at ¶ 5. She also found Harris "evidences impaired speed for processing information," "demonstrates impaired ability to reason when a

---

[10] In its analysis of this claim, the OCCA never mentioned the full-scale score of 63 Harris obtained on the WAIS-III administered by Dr. Nelda Ferguson on October 20, 2000. Doc. 32, Ex. 2.

situation or problem is ambiguous," and "has an impaired ability to anticipate consequences and plan effectively." *Id.*

The OCCA also unreasonably ignored Dr. Callahan's explanation of Harris's history of IQ testing and the application of current clinical standards to those past tests. Dr. Callahan noted "[c]omparison of the current findings with prior evaluations does appear to indicate some variability in scores for intellectual ability. However, closer review of those results indicates greater consistency than one may appreciate initially." Doc. 32, Ex. 1, A-2 at 8. Had the OCCA not unreasonably ignored Dr. Callahan's report and had it applied current clinical standards, it would have more accurately assessed the two higher scores on which it relied to find Harris did not meet the first *Murphy* prong.

With respect to the results of the WISC on which Harris received a full-scale score of 83 when he was seven years old, Dr. Callahan explained this score is complicated by two contemporary clinical standards:

> First, an individual's IQ is not truly represented by a single number. Rather, a person's true IQ falls within a defined possible range and will vary under normal circumstances while remaining within that range. For the WISC, the IQ range for a score of 83 was from 78 to 88.

> Second, Mr. Harris was administered the WISC in 1964, which is 15 years after the test was introduced. Since that time, scholars have since found what is often referred to as the "Flynn" effect. The Flynn effect refers to the observation that the average IQ drifts upwards slightly each year, which necessitates the development of new IQ tests on a regular

basis. The publishers of the WISC have acknowledged that for this series of tests, the Flynn effect is most pronounced in lower IQ ranges. In this test series, the Flynn effect equates to scores drifting ⅓ to ½ a scaled score point annually. For Mr. Harris, this means that a score of 83+/-5 in 1964 would equate to a score of 75.5 +/-5 (using the more likely ½ point drift estimate) had the WISC not been as dated of a test at the time of the administration to Mr. Harris.

*Id.* at 8-9.

With respect to the results on the WAIS-III on which Harris received a full-scale score of 75 on July 20, 2001, while he was at Eastern State Hospital, Dr. Callahan explained tests of malingering indicated Harris fell within normal limits. *Id.* at 3; Doc. 32, Ex. 4. Once the SEM is applied, which is required under Supreme Court precedent,[11] the results on this test place Harris in the IQ range of 70-80.

Counsel for Harris is aware this Court has twice held the OCCA's refusal to apply the Flynn effect to a petitioner's IQ scores is not contrary to or an unreasonable application of clearly established federal law. *See Hooks v. Workman*, 689 F.3d 1148, 1170 (10th Cir. 2012); *Smith v. Duckworth*, 824 F.3d 1233, 1246 (10th Cir. 2016). But both cases are easily distinguishable from Harris's case. In *Hooks*, the petitioner was given an *Atkins/Murphy* jury trial wherein the only issue was whether the petitioner could prove his mental retardation by a preponderance of the evidence.

---

[11] *See Hall*, 134 S. Ct. at 1995, 2000-01 (characterizing the SEM as a "statistical fact" and mandating application of SEM).

*Hooks*, 689 F.3d at 1164. The OCCA had granted the petitioner an *Atkins/Murphy* trial, notwithstanding the petitioner had nine prior IQ scores ranging from 53 to 80. *Id.* at 1168. On appeal to this Court, the petitioner challenged the sufficiency of the evidence to support the jury's verdict finding him not mentally retarded and the OCCA's and district court's upholding of the same. *Id.* at 1164.

Clearly, *Hooks* is inapposite, because unlike Mr. Hooks, Harris never received a full and fair hearing on whether he could prove his intellectual disability by a preponderance of the evidence. And Harris is not raising a sufficiency-of-the-evidence claim, which is assessed by the hybrid *Jackson/Atkins* standard applied in *Hooks. Id.* at 1166 (finding "[t]he different standard of proof requires us to tailor *Jackson* to fit this context. . . . [t]he relevant constitutional standard for the state appellate court was whether, viewing the evidence in the light most favorable to . . . (the State), any rational trier of fact could have found Mr. Hooks *not* mentally retarded by a preponderance of the evidence. If so, Mr. Hooks's evidentiary challenge would fail").

In *Smith*, the Flynn effect's relevance arose in a slightly different context. There, the petitioner's *Atkins* claim was not raised in the state court until *after* the Oklahoma legislature had enacted Okla. Stat. tit. 21, § 701.10b, the statute ostensibly barring the execution of the intellectually disabled. *Smith*, 824 F.3d at 1244-45. The

33

statute mirrors the *Murphy* definition, but added an additional diagnostic criterion: "in no event shall a defendant who has received an intelligence quotient of seventy-six (76) or above on any individually administered, scientifically recognized, standardized intelligence quotient test . . . be considered mentally retarded." Okla. Stat. tit. 21, § 701.10b(C). Because the petitioner presented scores of 71, 76, and 79, *Smith*, 824 F.3d at 1244, he was automatically precluded from receiving an *Atkins/Murphy* hearing pursuant to the Oklahoma statute.

Again, there are clear contrasts between *Smith* and Harris's case that make *Smith* inapplicable. Most importantly, Harris's claim was not adjudicated by the OCCA pursuant to Okla. Stat. tit. 21, § 701.10b because the statute was not in effect when the claim was raised. In fact, nowhere in the OCCA's opinion is Okla. Stat. tit. 21, § 701.10b even mentioned. Harris's substantive *Atkins* claim was assessed pursuant to the definition in *Murphy. Harris*, 164 P.3d at 1115 n.54. Therefore, the Oklahoma statute was not relevant to the OCCA's determination of prejudice. Further, the petitioner in *Smith* had no unadjusted IQ scores at 70 or below; Harris has three unadjusted scores below 70, thereby satisfying the threshold requirement in *Murphy* to trigger a hearing.

But most relevantly, neither *Smith* nor *Hooks* stands for the proposition that a jury tasked with determining whether a defendant is intellectually disabled should be

34

prohibited from hearing evidence about the Flynn effect. And had Mr. Rowan reasonably investigated Harris's intellectual disability, he would have learned that there is a "scientific and professional consensus that the Flynn effect is a scientific fact." Kevin S. McGrew, *Norm Obsolescence: The Flynn Effect,* in *The Death Penalty and Intellectual Disability* 155, 158 (Edward Polloway, ed., 2015). Adjusting for the effect in *Atkins* settings is also the consensus best practice. *Id.* at 160-61. The AAIDD mandates recognition of the Flynn effect when older editions of an IQ tests are used. AAIDD, *User's Guide: Mental Retardation, Definition, Classification and Systems of Supports* at 20-21 (10th ed. 2007).

Because the OCCA ignored Dr. Callahan's report and disregarded current clinical practices, it unreasonably disregarded overwhelming evidence of Harris's significantly sub-average functioning, instead choosing to focus on the two unadjusted scores addressed above. In addition to the properly adjusted scores, which clearly place Harris in the intellectually disabled range, numerous results on other IQ tests confirm Harris's significant sub-average intellectual functioning:

- Dr. Nelda Ferguson administered the WAIS-III to Harris on October 20, 2000. He received a full-scale score of 63. Doc. 32, Ex. 2.

- Dr. Martin Krimsky administered the SIT-R to Harris on March 8, 2001. He received a full-scale score of 66. Doc. 32, Ex. 3.

- Dr. Krimsky administered the WAIS-R to Harris on March 21, 2001. He received a full-scale score of 68. *Id.*

During Harris's 2001 competency hearing, Dr. Krimsky addressed the two rounds of testing resulting in scores below 70. He concluded the scores indicated Harris was mildly mentally retarded. Comp.Tr. Vol. 1 at 58, 64-65.[12] The Supreme Court has recognized that "mild" mental retardation is not a trivial or insignificant disability. *See Atkins*, 536 U.S. at 308-09 & n.5. Individuals who are "profoundly or severely retarded" are unlikely to be convicted, thus, "most retarded people who reach the point of sentencing are mildly retarded." *Penry*, 492 U.S. at 333. *See also* James R. Patton & Denis W. Keyes, *Death Penalty Issues Following Atkins*, 14 Exceptionality 237, 238 (2006) ("[A]lmost all capital cases with an *Atkins* claim involve individuals whose levels of intellectual and adaptive functioning fall in, at, or near the mild range").

Further, the district court erred by relying on Harris's "decades of drug and alcohol abuse along with the stress of incarceration and mental illness with accompanying hallucinations and delusions" to discount his IQ scores below 70. Doc. 77 at 36. As the Supreme Court and "mental-health professionals recognize, . . . many intellectually disabled people also have other mental or physical impairments."[13]

_____

[12] According to Dr. Krimsky, Harris was not malingering or "attempting to fool the test." *Id.* at 65.

[13] In *Moore*, the Supreme Court also recognized the scientific reality that traumatic childhood experiences are "risk factors" for intellectual disability. *Moore*, 137 S. Ct. at 1051. Harris undoubtedly suffered from a traumatic and abusive

*Moore*, 137 S. Ct. at 1051. That Harris also suffers from other severe psychiatric problems does not render him less likely to suffer from intellectual disability.

Clearly, Harris presented enough evidence to meet the *Murphy* threshold to trigger a pre-trial determination of his intellectual disability. And had his attorney reasonably investigated and presented an *Atkins/Murphy* defense, a reasonable probability exits at least one juror would have found Harris suffers from significantly sub-average intellectual functioning. *See Blonner,* 127 P.3d at 1142. Both the OCCA and the district court unreasonably determined otherwise.

### ii.    Significant limitations in adaptive functioning.

Although intelligence, as measured by IQ, has predominated as the primary criterion for diagnosing intellectual disability, sub-average intellectual functioning must coexist with related limitations in two or more areas of adaptive behavior. *Atkins*, 536 U.S. at 308 n.3. And as *Murphy* sets out, in Oklahoma, the enumerated skill areas include: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work. 54 P.3d at 567-68.

Crucial is the fundamental precept that adaptive behavior *must* be evaluated on a deficit model. Intellectually disabled individuals, like all individuals, have

childhood. 2005 Tr. Vol. V at 39-45.

strengths, and these strengths do no negate their disability. *See Moore*, 137 S. Ct. at 1043 (noting "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*"); *see also Brumfield*, 135 S. Ct. at 2281 (finding "intellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation'") (quoting *Mental Retardation: Definition, Classification, and Systems of Supports* at 8 (AAMR,10th ed. 2002)).

While it is difficult to decipher whether the OCCA in fact found Harris did not suffer from significant limitations in adaptive functioning, it appears the court placed great emphasis on his "aptitude as a transmission mechanic and other [unnamed] characteristics" to conclude such strengths "were not those of a mentally retarded person." *Harris*, 164 P.3d at 1115.  Further, the district court relied on Harris's testimony from his 2001 trial, which the court characterized as "coherent, responsive, and demonstrat[ing] a strong vocabulary with a good memory for details," his lengthy work history as a transmission mechanic, and his "ability to care for himself and for others" to conclude Harris did not suffer from significant adaptive behavior deficits. Doc. 77 at 36.

By relying on Harris's work history and prior testimony, at the exclusion of overwhelming evidence of the support provided by his wife during his career as a

mechanic and other evidence of deficits, the lower courts made unreasonable determinations of fact.

There is evidence in the record below to establish Harris suffers from severe limitations in the following adaptive functioning areas:

1.  Self-direction - Dr. Callahan reported Harris has an impaired ability to reason when a situation is ambiguous and an impaired ability to anticipate consequences and plan effectively. Doc. 32, Ex. 1, Aff. at ¶ 5.  At Harris's 2005 resentencing, Dr. Draper testified Harris's low intellectual functioning made him ill-equipped to cope with the stress of life. 2005 Tr. Vol. V at 67-68, 71.

2. Academics - Evidence presented prior to *Atkins* clearly established Harris struggled in school, relied on tutors and special education, did not finish high school, does not read or write well, and lacks comprehension skills. 2001 Tr. Vol. 11 at 85-87; Vol. 15 at 7, 136, 140; Vol. 16 at 125; 2005 Tr. Vol. 5 at 27-68, 123, 148-50. Results on a Wide Range Achievement Test, WRAT-3, administered by Dr. Ferguson in 2000 reflected Harris's impaired skills in word recognition, spelling, and arithmetic. Results on the WRAT-4 by Dr. Callahan in 2006 indicated Harris's grade level is at the first-grade level for spelling and second-grade level for word recognition, spelling comprehension, and math computations. Doc. 32, Ex. 1, A2 at 3, 7.

3.  Communication - A former employer testified when he asked Harris for an explanation "there would be long pauses between his statements, there would be confusion when he spoke. He would start one sentence and end it with a different sentence." 2001 Tr. Vol. 12 at 28-29.

4.  Health & Safety/ Self-Care - Harris's childhood friend, Ron Salladay, affirmed as a child Harris engaged in dangerous activities without regard for his safety and often injured himself. For example,

> [w]hen [we] were teenagers . . . I was riding on the back of the motorcycle and Jimmy Dean was driving. We were riding near a construction area . . . . Jimmy Dean drove up the side of one of those mounds [of dirt], and then off the other side. We dropped about thirty feet. Neither of us wore a helmet and we were seriously injured. . . . Another time, Jimmy Dean flipped his motorcycle, . . . . Again, we were injured. There were no limits with Jimmy Dean, as he had no concept of safety.

Doc. 32, Ex. 5, ¶ 4. The record below is also replete with Harris's lifelong substance abuse - certainly calling into questions his functioning in the area of self-care.

Undoubtedly, Harris could assemble a transmission; he learned that trade over more than 30 years, beginning in his teens with his father. But it cannot be overstated how much support he had from his wife in his trade. Harris could not read the manuals; Pam had to read those to him and help him learn new information. 2005 Tr. Vol. 5 at 55-58, 157. As the OCCA recognized at one time, intellectually disabled

40

individuals can drive, hold jobs, make money, and operate heavy machinery. *Lambert v. State*, 126 P.3d 646, 657 (Okla. Crim. App. 2005).

The OCCA acted unreasonably by relying on Harris's employment as a transmission mechanic to conclude he did not have the traits of an intellectually disabled individual, and the district court erred by endorsing the same.

## C.    Conclusion.

Harris was indeed prejudiced by trial counsel's  failures to investigate and present an *Atkins* defense to Harris's death eligibility. The OCCA concluded otherwise only by unreasonably applying clearly established federal law and by engaging in unreasonable factual determinations. At a minimum, Harris provided sufficient evidence to merit an evidentiary hearing. This Court should reverse with directions to grant the Writ, or alternatively, conduct a hearing.

## PROPOSITION TWO

**HARRIS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT AVAILABLE EVIDENCE OF MENTAL ILLNESS AS MITIGATION IN THE 2005 PENALTY RETRIAL.**

**A.    Where the Claim Was Raised.**

This claim was raised in Ground Eight of Harris's habeas petition, Doc. 32 at 130-168, and in his Motion for Evidentiary Hearing, Doc. 33 at 5-6. The district court denied relief. Doc. 77 at 37-44.

**B.    Arguments and Authorities.**

**1.    Introduction.**

Since at least 2000, the Supreme Court has held trial counsel for capital defendants have the duty to introduce evidence of mental illness that explains a capital defendant's violent behavior, the symptoms that influence a jury's appraisal of a defendant's moral culpability, and why the jury should select a penalty less than death. *See Williams v. Taylor*, 529 U.S. 362, 397-399 (2000), embraced by this Court in *Smith v. Mullin*, 379 F.3d 919, 944 (10th Cir. 2004). Evidence supporting Harris's lack of "moral culpability" was readily available, but counsel unreasonably did not present it. In Oklahoma, as Harris's jury was instructed, "[e]ven if you find that the aggravating circumstance or circumstances outweigh the mitigating circumstance or

42

circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole." O.R. 1611. As mandated by *Williams,* Harris was entitled to the benefit of evidence that could influence the jury's selection of penalty ("Mitigating evidence *unrelated to dangerousness* may alter the jury's *selection of penalty*, even if it does not undermine or rebut the prosecution's death-eligibility case.") 529 U.S. at 398 (emphasis added).

Mr. Harris's family members and coworkers believed he was intellectually slow and depressed. He often talked of suicide — including when Pam told him she wanted a divorce. 2001 Tr. Vol. 7 at 153-57, 182; Vol. 11 at 8-87, 98-100, 114, 134; Vol. 12 at 155-56; Vol. 15 at 19-20. His sister Jamie testified about an early suicide attempt when Harris drank Raid bug killer. 2001 Tr. Vol. 11 at 125-26. Mr. Harris smoked marijuana almost daily beginning in his teens, regularly took excessive amounts of illicit and prescription drugs, and engaged in periodic drinking binges. As a teen, his drug and alcohol use was encouraged by his father, who provided Harris drugs and alcohol to sooth his pain after his mother's death in 1975. 2001 Tr. Vol. 11 at 42-50, 85-90, 122; Vol. 13 at 106-7, 140-44. His sister believed his life-long addiction to drugs and alcohol was self-medicating his depression. 2001 Tr. Vol. 11 at 122, 125-26.

Dr. John R. Smith, psychiatrist, testified at Harris's 2001 trial that Harris was suffering from Bipolar II Disorder with Psychosis plus Dependency and Addiction at the time of the 1999 murder. 2001 Tr. Vol. 18 at 135, 135-90.  He explained bipolar II is primarily a disorder of recurrent depressions evidenced by hypomania – an  excitability and obsessiveness resulting in behavior that is more "hostile, more pushy, more obsessed." *Id.* at 135. He also suffered from hallucinations. He could "see things, hear things, smell things, that aren't really there." *Id.* at 147. His brain produced the smells, images, and auditory sounds; such stimulation came from within the brain.  *Id.*

In 2005, prior to the retrial, neuroimaging studies of patients suffering from bipolar disorder demonstrated significant organic brain abnormalities, including in the prefrontal cortex. *See* Dr. Stephen Strakowski, et al., *The functional neuroanatomy of bipolar disorder: a review of neuroimaging findings*, Molecular Psychiatry (Feb. 2005). It is now an accepted  neurological fact that bipolar disorder is an organic disorder of the brain. *See* Casey P. Johnson, et al, *Brain Abnormalities in Bipolar Disorder Detected by Quantitative T1p Mapping,* Molecular Psychiatry (Feb. 2015).

Although the 2005 jury that sentenced Petitioner to death was unaware of it, within days of the murder in September 1999 and during his pretrial incarceration, the

44

mental health professionals in the Oklahoma County Jail recognized he was mentally ill and heavily medicated him. Immediately following his arrest, Harris appeared psychotic and was placed on "suicide precautions." Comp.Tr. Vol. 1 at 7. In October 1999 he was sent for treatment to Eastern State Hospital with a Global Assessment of Functioning ("GAF")[14] score of 21. In November 1999, his GAF rose to 35, and when he returned to court in March 2000, his GAF score was 50. Comp.Tr. Vol. 2 at 301-05. He returned again to court in July 2001 with orders for continued medication to maintain his competency. He continued to suffer from depression, anxiety, tremors, and audio hallucinations. Comp.Tr. Vol. 1 at 7-8, 15-16, 159, 164-65, 184-85; O.R. 899-900.

At his April 2001 competency trial, the court determined him to be competent when properly medicated and ordered continued monitoring. Comp.Tr. Vol. 3 at 479-87; O.R. 691-93. When his medications were incorrectly dispensed, his mental condition deteriorated and required judicial intervention to ensure he was properly

---

[14] In general, the GAF scale is used to rate the seriousness of mental illness based on how symptoms affect day-to-day life on a scale of 0 to 100. With a GAF score of 21, behavior is influenced by delusions or hallucinations, or inability to function in almost all areas. At 35, impairment in reality and impairment in work, school, family relations, judgment, thinking or mood. At 50, serious symptoms and impairments surface in social, occupational, or school as well as suicidal ideations. Comp.Tr. Vol. 2 at 300-05; *See also* https://www.webmd.com/mental-health/gaf-scale-facts. (last visited 7/2/18).

45

medicated. *See* M.Tr. 08/01/01, M.Tr. 08/15/01, M.Tr. 08/16/01, O.R. 1002-04, Comp.Tr. Vol. 1 at 234-38, Vol. 2 at 366-68 (listing medications).

Anna Wright, mental health counselor at the jail, testified Harris appeared psychotic and unstable, was reporting both visual and audio hallucinations, and had a "glazed" affect. Comp.Tr. Vol. 1 at 7-10. He seemed to be stable only while medicated. *Id.* at 22. Dr. Terese Hall, a state witness, concluded Harris suffered a major depressive episode with associated psychotic features that were stabilized through medication. Comp.Tr. Vol. 2 at 306-07. The county jail psychiatrist, Dr. Stanley Ardoin, believed Harris suffered from schizo-affective disorder, an affliction which could be controlled with medication. *Id.* at 366-67. State's witness Dr. Edith King recognized Harris was on the low end of the competency spectrum, suffered auditory hallucinations, was delusional, and mentally ill. *Id.* at 424-28.

Dr. Smith testified in the 2001 jury trial that to achieve competency, Harris was treated with Depakote for impulsivity, agitation, and hypomania. He was also treated with Risperdal and Celexa for depression. 2001 Tr. Vol. 18 at 136-37. These medications made it possible for Petitioner to be present at the trial with some degree of focus. *Id.* Dr. Smith saw him before he went to Eastern State Hospital and after he was treated and returned. There was "all the difference in the world. It was obvious the treatment was successful. He felt much more relaxed. . . . not depressed. He

46

could focus during the interview.  And his delusions were kind of faint shadows. [Delusions] were no longer dominant in his thinking, nor was he acting on them." *Id*. at 137-38. From monitoring Petitioner in jail, Dr. Smith recognized when Harris's medication was dispensed erratically, he deteriorated to his former condition. *Id.* at 140. When properly medicated his propensity for violence was lowered.  *Id*. at 173.

Dr. Smith testified to the improvement he noticed in Harris's condition after he was *properly medicated* — from shortly after the offense in 1999 until the first trial in 2001. *Id*. at 141-51. Dr. Smith testified that DOC, where  Petitioner will be forever housed, has made "enormous strides forward in the adequate treatment of the thousands of people who are mentally ill within the prison system. . . . .He will be seen regularly by the psychiatrist and . . . counselor, [and] these specific medications are . . . available on the prison formulary*." Id.* at 152-53.

The import is clear — Harris's mental condition contributed to his actions leading up to Merle Taylor's death. His mental condition is treatable with proper medication, and he will receive this medication while imprisoned. This missing evidence refutes any argument that his mental illness increases the likelihood of "continuing threat."

Despite the existing testimony of these mental health professionals, trial counsel did not call even one of them at his 2005 resentencing trial although he listed

"mental condition" as a mitigating circumstance. O.R. 1608-10. His mitigation plan,

or as the OCCA termed his "different path," included offering purely hearsay

evidence of mental problems through developmental psychologist Wanda Draper's

review of medical records and psychiatric reports. *Harris*, 164 P.3d at 1118. When

the prosecution's objections thwarted his strategy, trial counsel tried to establish

through Draper that Harris was taking "medications" for it, which was also defeated

by state's objection:

> ROWAN:   And have you seen any records of medications given to him in the jail?
>
> DRAPER:   Yes. I think he's taking some psychotropic drugs and some other medications for general health problems.
>
> ROWAN:   And you're not a physician, but you do know that the drugs are for controlling mental illness?
>
> DRAPER:   Yes. . . .
>
> ROWAN:   Do physicians normally treat people who are well with psychotropic drugs?
>
> HIGH:   And I'm going to object, Judge. It's clearly beyond her area of expertise. All she has done is [ ] read some medical records. She is not qualified to give that opinion. . . .
>
> ROWAN:   Judge, I will withdraw the question.

2005 Tr. Vol. 5 at 68-70.

## 2.    Treatment by the Lower Courts.

In denying relief, the OCCA unreasonably determined the vague, non-specific

testimony of Dr. Draper was all that the Constitution required based on trial counsel's

"strategic decision" not to present expert testimony regarding Harris's mental illness

– testimony that would have explained his violent acts both before and at the time of the murder.

The district court adopted  the OCCA's opinion, concluding its denial of this claim was based on Supreme Court authority finding counsel ineffective where the failure to thoroughly investigate and present mitigating evidence "*resulted from inattention*, not reasoned strategic judgment." Doc. 77 at 41; *Harris*, 164 P.3d at 1116-18 (quoting *Wiggins v Smith*, 539 U.S. at 526) (emphasis added).

On direct appeal the OCCA held:

> After thoroughly considering the evidence which was presented at Harris's resentencing trial, and the evidence which was presented earlier and could have been presented, this Court concludes that counsel was not ineffective. Counsel was aware of the evidence of mental condition and status.

*Harris*, 164 P.3d at 1118. The OCCA made these additional findings and endorsed trial counsel's decision to "take a different path":

> He called Dr. Draper to testify regarding Harris's development over his life. This evidence was comprehensive. It included Harris's troubled and abusive childhood, his low IQ and trouble in school, his difficulty with marital relationships, his relationships with his family and daughters, his dependency on Pam, the mutually abusive nature of that relationship. Dr. Draper also discussed Harris's chronic substance abuse which began when he was a teenager with his father, his poor judgment, anger and inability to solve problems, and his extreme emotional instability. She also discussed the likelihood that, based on his past behavior and mental state, Harris would be a danger in the future. While Harris's specific diagnoses of mental illness were not presented to the jury, jurors were

49

told he had been diagnosed as mentally ill. Those diagnoses were made after the crimes, and Dr. Draper did describe the highly emotional mental state Harris was in at the time of the crimes. Dr. Draper used all this evidence to explain why Harris *could not accept his circumstances and resorted to murder*.

Harris claims that the prejudice from this decision is evident . . . . Counsel chose to provide Harris's resentencing jury with a thorough picture of his life, intelligence, and emotional state, including his anger, grief and despair immediately preceding the crimes. Through Dr. Draper, jurors heard evidence which encompassed or incorporated some of the evidence presented at the first trial. We will not second-guess counsel's reasoned strategic judgment. Counsel's choice of mitigating evidence did not amount to ineffective assistance.

*Harris*, 164 P.3d at 1118.

In denying relief on this claim the OCCA unreasonably determined that because "counsel was aware of the evidence of mental condition and status," his decision to make vague references to mental illness through Wanda Draper was an objectively reasonable strategic decision.

### 3. Trial Counsel's Attempt to Introduce Evidence of Harris's Unexplained Mental Illness Through An Unqualified Witness Was Objectively Unreasonable.

The OCCA's determination that "counsel was not ineffective" is an unreasonable application of *Wiggins*, 539 U.S. at 526 (citing *Williams,* 529 U.S. at 397, 399).

Every time counsel tried to introduce Harris's previous diagnoses of mental

illness through Dr. Draper, the prosecution's objections were sustained. 2005 Tr.

Vol. 5 at 67-70. On cross, Dr. Draper admitted she was *not qualified* to speak to any

psychological issues because she was "dealing with his development, not his

psychiatric problems." *Id*. at 129. Prosecutor High closed the door on mental illness

by this follow up question:

| | |
|---|---|
| HIGH: | So if Jimmy Dean Harris wants this jury to consider . . . a psychiatric problem he needs to bring a psychologist in here, doesn't he? |
| DRAPER: | Well, I don't want to make that judgment. . . . |
| ROWAN: | Judge, I would object about what he needs to do. |
| COURT: | Okay. She answered. She answered that she doesn't make that judgment. |

*Id.* at 129.

The OCCA's conclusion that trial counsel made a reasoned "strategic

judgment" *not* to present Petitioner's mental illness as mitigation is incorrect based

on clear and convincing evidence. Therefore, Petitioner can overcome AEDPA

deference because this determination was based on an unreasonable determination of

facts triggering review under 28 U.S.C. § 2254(d)(2). "[W]here the state courts

plainly misapprehend or misstate the record in making their findings, and the

misapprehension goes to a material factual issue that is central to petitioner's claim,

that misapprehension can fatally undermine the fact-finding process, rendering the

resulting factual finding unreasonable." *Sharp v. Rohling,* 793 F.3d 1216, 1229 (10th

51

Cir. 2015) (citing *Byrd v. Workman*, 645 F.3d 1159, 1171-72 (10th Cir. 2011)).

Although § 2254(d)(2) requires "substantial deference" be accorded state-court

factual determinations, "[e]ven in the context of federal habeas, deference does not

imply abandonment or abdication of judicial review." *Brumfield v. Cain*, 135 S. Ct.

2269, 2277 (2015).

Clearly, the record shows trial counsel  recognized the mitigating effect of

Harris's mental illness and his "different path" mitigation plan included mental

illness. However, he unreasonably and negligently tried to present mental illness

through Draper, a developmental psychologist, by quoting earlier hearsay diagnoses

of medical doctors. At best, counsel's plan was to inform the jury that Harris had been

diagnosed with mental illness — although he planned not to call any previous doctors

or qualified mental health expert to explain how and why this available evidence

affected his decision making, his choices, his prior acts of violence and *how it*

*contributed to the likelihood the murder would happen*.

This fatally flawed "strategy" was founded on poor judgment and counsel's

"*inattention*" to Oklahoma law, the rules of evidence, and failure to create a cogent

mitigation plan. Trial counsel unreasonably believed a developmental psychologist

could present the mental diagnoses of previous medical doctors who examined Harris

before his 2001 trial. Counsel finally conceded after the state's objections were

52

sustained that Draper was "not qualified" to testify or introduce evidence concerning mental illness. 2005 Tr. Vol. 5 at 152.

As this debacle unfolded, trial counsel recognized his error that Harris's mental illness — a critical element in his mitigation plan — was not before the jury. In desperation he subpoenaed Dr. Harvey, the jail psychiatrist, but then released him because he was "pushy." 2005 Trial Vol. 5 at 149. He attempted to call Dr. Harvey to testify Harris's jail prescriptions were "mental health medications." *Id.* at 149-50. Mr. Rowan opined this "goes to mitigation, that he has got something wrong with him and we don't know what it is," *id.* at 151-52, and that it "tends to prove a mitigating circumstance . . . [t]hat he has a mental illness." *Id.* at 228.

This removes any supposition that part of counsel's "different path" included presenting a mental illness label without any explanation how this mental illness affected Harris and its relevance to his violent actions. He admitted Draper was an incompetent witness for those purposes. *Id*. at 152. He acknowledged his lame effort of attempting to present Harris's mental illness through the jail medical doctor was entirely inexcusable: "I clearly say it's my fault." And he suggested the court "fine me some money or something." *Id*. at 151-52. Finally, trial counsel admitted he "didn't do it correctly." *Id.* at 226. The court sustained the state's objection to Dr. Harvey's testimony for lack of notice and excluded evidence of the psychotropic jail

medications. *Id*. at 231.

After resting, counsel asked to "tweak" his "list of mitigators." *Id*. at 231. In spite of his failure to present evidence of Petitioner's mental illness, counsel still listed "mental condition" as a mitigating factor: "Jimmy Dean Harris's mental condition, his alcoholism and drug abuse combined with strong emotions led to his decision to bring a gun to AAMCO Transmission and ultimately murder Merle Taylor." O.R.1608-10. The absence of evidence of mental illness in this resentencing trial was not "a reasoned strategic decision." It was the result of poor planning and research that amounted to pure negligence and ineffective assistance of counsel under *Strickland* and the Sixth Amendment.

Counsel's unreasonable strategy additionally exposed Harris's mitigation case to a derogatory and demeaning closing argument by Prosecutor High, where she discredited "mental condition" as an explanation for his "decision to bring a gun to AAMCO Transmission and ultimately murder Merle Taylor." Prosecutor High asked the jury: "Who told you that? Where did they get that from? . . . What mental condition? Where did you hear about a mental condition? Nobody talked about a mental condition. There's been no evidence of any mental condition." 2005 Tr. Vol. 6 at 937. Prosecutor High was right — there was no evidence of a mental condition presented — in spite of over 200 pages of mental health testimony available and

presented in the original 2001 trial. 2001 Tr. Vol. 15 at 89-242; Vol. 18 at 135-90.

The OCCA made the following finding: "While Harris's specific diagnoses of mental illness were not presented to the jury, jurors were told he had been diagnosed as mentally ill."*Harris*, 164 P.3d at 1118. As demonstrated by the record, such finding is an unreasonable determination of fact. 28 U.S.C. § 2254(d)(2). Defense counsel in his closing argument apparently agreed with Ms. High's assessment that "there's been no evidence of any mental condition" and that evidence of "mental illness" was not before the jury as a mitigating factor. He had no answer to Prosecutor High's argument and abandoned any thought of arguing Harris was mentally ill or had "mental problems." Instead, in closing he only briefly mentioned Harris was "close" to being "mentally retarded." 2005 Tr. Vol. 6 at 944.

Contrary to the OCCA's determination, there exists "clear and convincing evidence" in the state court record that trial counsel did not make a "reasoned strategic judgment" or "choice" not to rely on mental illness as a mitigating factor. The record is clear he decided *to do both* – to introduce evidence of Harris's development and "life path," which encompassed 99.9% of Dr. Draper's testimony, but also insert mental illness generally without investigating and retaining qualified experts to explain the symptoms and relevance. Counsel's inattention, poor planning, and fallacious tactics were confirmed by Draper's admission she was not qualified to

55

speak to psychological issues because she was "dealing with his development, not his psychiatric problems." 2005 Tr. Vol. 5 at 129. There is clear and convincing evidence counsel belatedly tried to pursue mental illness as part of his mitigation "path" but failed. The jury heard no evidence such as that available from Dr. Smith that could have explained Petitioner's bipolar II disorder and how it affected his actions.[15]

Introducing evidence of Harris's developmental problems was not an unsound decision. However, counsel's poor planning and legal research excluded the most critical evidence that could have explained *why* Petitioner could not control his rage and committed murder and which could have complemented the evidence of childhood trauma. Counsel did not identify Harris's mental illness nor "*explain[] the significance*" of it to the jury to consider in selecting a proper penalty. *See Williams*, 529 U.S. at 399.

---

[15] "Q. On September lst, while he was suffering from bipolar disorder, do you think that he would have a hard problem interpreting reality?  A. (Dr. John R. Smith)Yes. I think that very often -- number one, he was in a highly agitated, enraged state. That in itself would cause misperceptions and misinterpretation of environmental clues, or totally ignoring environmental clues. I think that part of his difficulty, since I believe that he has a more pervasive mental disorder, would be that when strong, strong affect or feeling is generated, as was true in this case, that you would have an especially difficult time managing and controlling your rage." 2001 Tr. Vol. 15 at 211-12.

*Strickland* counsels deference to trial counsel's *plausible legal strategies* —

it does not endorse ignoring expert testimony that could explain the relevance and

importance of Petitioner's mental limitations. *Strickland,* 466 U.S. at 689. Simply

because trial counsel "was aware of the evidence of mental condition and status,"

*Harris*, 164 P.3d at 1118, does not automatically mean his decision was "strategic"

or "sound trial strategy." *Strickland,* 466 U.S. at 689. *See also Fisher v. Gibson,* 282

F.3d 1283, 1296 (10th Cir. 2002) (holding attorney's failure to present mitigation

evidence cannot be considered strategic where that decision was influenced by

inadequate preparation and investigation).

"[S]trategic choices made after less than complete investigation are reasonable

precisely to the extent that reasonable professional judgments support the limitations

on investigation." *Strickland,* 466 U.S. at 690–91. In this case, "the strategic decision"

the OCCA and the district court invoked to justify counsel's decision making,

resembles a "*post hoc* rationalization" of counsel's negligence in the presentation of

mental illness — rather "than an accurate description of their deliberations prior to

sentencing." *Wiggins,* 539 U.S. at 526-27. The Supreme Court has sent clear signals

in cases such as *Williams, Wiggins,* and *Rompilla v. Beard*, 545 U.S. 374 (2005),[16]

---

[16]In *Rompilla,* failure to obtain a crucial file "was the result of inattention, not
reasoned strategic judgment." 545 U.S. at 395-96 (quoting *Wiggins*, 539 U.S. at 534).

that the penalty phase of capital cases must be reasonably and thoroughly investigated. Only "informed" decisions qualify for the shroud of protection of a "strategic decision." An investigation that is reasonable under the circumstances is essential to strategic decision-making and ultimately to effective attorney performance.

The Supreme Court restated this principle in *Sears v. Upton*, 561 U.S. 945, 954 (2010), where the Court rejected any suggestion counsel's decision was "justified by a tactical decision" when counsel did not "fulfill their obligation to conduct a thorough investigation." There, counsel was determined ineffective when "counsel presented what could be described as a superficially, reasonable mitigation theory during the penalty phase." *Id.* Potential importance of the evidence is significant to the deficiency inquiry, whereas actual importance is significant to prejudice. The mental health information here was both potentially and actually of critical import.

A decision cannot be fairly characterized as "strategic" unless it is a conscious choice between two *legitimate* and *rational* alternatives. Mr. Rowan's decision to urge mental condition as a mitigating factor and try to utilize an educational psychologist as an expert to present the evidence of mental illness was not legitimate or rational "at the time it was made."[17]  Assuming arguendo that Rowan's decision

---

[17] *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, *to*

qualified as "reasoned strategic decision" as determined by the OCCA, this determination is an objectively unreasonable application of *Strickland* to the facts in the record.

The OCCA's holding "we will not second-guess counsel's reasoned strategic judgment," *Harris*, 164 P.3d at 1118, is a recalcitrant failure to correctly apply the *Strickland* standard, is contrary to or an unreasonable application of *Strickland,* and is not entitled to deference. *See Johnson v. Sec'y, Dep't. of Corr.,* 643 F.3d 907, 935 (11th Cir. 2011) (holding "[i]n *Harrington* terms, fairminded jurists could not disagree . . . the state court's denial of this claim was inconsistent with earlier Supreme Court decisions, including *Strickland* and *Williams*"). The issue of defective performance and the corresponding effect on prejudice under *Strickland* are entwined. *See Fisher,* 282 F.3d at 1303 n.11 (finding "these items therefore relate to both the various deficiencies of counsel we identify and to prejudice").

### 4.    Prejudice.

Neither *Wiggins, Strickland,* nor *Williams* holds that trial counsel's strategic decision will "never be second guessed." It is an elementary principle that in a capital case if defense counsel determines mental illness is necessary to paint an accurate

---

*reconstruct the circumstances of counsel's challenged conduct*, and to evaluate the conduct from counsel's perspective at the time") (emphasis added).

picture of the defendant's life and conduct, an appropriate expert must be retained.

Counsel's failure to retain a psychologist or psychiatrist who could identify and explain mental illness had the same effect as in *Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004), although for a slightly different reason. In *Smith,* like in *Williams,* the aggravating circumstances were "strong," much stronger than in Mr. Harris's case.[18] Smith's lawyer introduced evidence in the first stage (like in Harris's 2001 trial) to establish inability to form the *mens rea* for first-degree murder but then told the jury not to consider it in the second stage. In Harris's 2005 resentencing trial, counsel proffered "mental condition" as a mitigating circumstance, but it was unsupported by the evidence, as pointed out in closing argument by Prosecutor High. 2005 Tr. Vol. 6 at 937. Unfortunately, Prosecutor High was right.

There are two fundamental categories of mitigation — the type that illustrates good qualities and traits, which was presented; but equally important is expert testimony that explains how *untreated* mental illness prevented "a good man" from controlling his "strong emotions" or rage. As noted in *Smith*, experienced death penalty litigators recognize that "juries respond to . . . and [they] are more likely to vote for life rather than death . . . where there is . . . clearly presented evidence that

---

[18] The State's case in favor of the death penalty was strong. The jury found four aggravating circumstances as to the deaths of each child (four children and their mother were murdered and stacked in a closet). *Id*. at 944.

the defendant has suffered from some form of mental illness." *Smith*, 379 F.3d at 942.

The *Smith* panel confirmed this view with "available empirical evidence as to juror

attitudes." *Id.* (citing Stephen P. Garvey, *Aggravation and Mitigation in Capital*

*Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559 (1998) (finding

evidence of mental retardation and mental illness to be the most persuasive mitigation

evidence and to have practically no aggravating effect)).

> ### i.    Trial Counsel's Ineffectiveness Opened the Door to the Prosecutor's False Claim Harris Was Malingering.

Moreover, trial counsel's attempt to have Dr. Draper testify to Petitioner's

mental state opened the door to misleading statements regarding  malingering that

easily could have been proven false. Prosecutor High posed the following question

to Dr. Draper: "So did you read the part about where he fails the malingering test that

indicates that he is exaggerating his symptoms?  A. Yes, I read  I believe that was Dr.

Calls' material." 2005 Tr. Vol. 5 at 127-28. The OCCA found that "[o]ne expert for

the State, and the doctors at Eastern State Hospital, *suspected* Harris was either

malingering or exaggerating his mental condition.*" Harris,* 164 P.3d at 1117

(emphasis added).  Counsel's "inattention" to mental illness was exacerbated by trial

counsel's failure to disprove the prosecutor's "malingering" assertion.

Before the 2001 trial, state expert Dr. John Call administered two tests to

determine malingering. 2001 Tr. Vol. 16 at 22-24. Neither test established

malingering, so any "suspicion" was unfounded. The two-part Validity Indicator Profile indicated his responses were valid on the nonverbal portion and "careless" on the verbal portion. *Id* at 66-67. On a second test, used to determine whether memory problems were feigned or malingered, Harris's responses indicated he was not malingering. *Id*. at 67. In addition, the 2001 competency proceeding contains a report by Dr. Krimsky, administered in April 2001, designed to rule out malingering: "As a whole the profile argues against malingering." Comp.Tr. Vol. 1 at 79; Def. Ex. 3 attached to Comp.Tr. Vol. 3. By the time Prosecutor High finished her cross-examination, the jury learned Dr. Draper was unqualified to convey whether Petitioner suffered from mental illness or not — but if he was mentally ill, he could be faking. Reasonable foresight and preparation by trial counsel could have prevented this.

### ii.    Evidence of Harris's Mental Illness Was Not Double-Edged.

In the 2005 resentencing trial, Petitioner did not claim he was innocent[19] or that

---

[19] This Court has previously determined that claims of innocence make omitted evidence of mental impairments affecting inability to control violent propensities "a two-edged sword." *Bryan v. Mullin*, 335 F.3d 1207, 1222 (10th Cir. 2003) (*en banc*); *see also Gilson v. Sirmons*, 520 F.3d 1196, 1244-50 (10th Cir. 2008) (finding brain damage and difficulties conforming his behavior to societal norms weighed against claims of innocence); *Wackerly v. Workman*, 580 F.3d 1171, 1179 (10th Cir. 2009) ($300 a day drug habit supplied motive for the murder and made him a threat to society).

he did not have the ability to form the intent to kill. The 2005 jury already knew of his difficulties controlling his explosive anger resulting in violence against his ex-wife, especially when triggered by his jealousy or financial inadequacies. This effectively removes any "double-edged" consideration regarding the prejudice from counsel's ineffectiveness.[20]  2005 Tr. Vol. 3 at 490-500. Pamela testified Petitioner once he tore up their house because his father refused to give him his pay check to buy a used car. *Id.* at 490. In 1980, Harris hit her in the face and shut her legs in the car door because she was not home when he got home after work. *Id.* at 492-494. A year later he became enraged and kicked Pamela in the jaw after his friend purchased medicine for their infant daughter that Harris could not afford. *Id.* at 498. Another time Pamela left home, and in a fit of rage, Petitioner broke the windows out of her grandmother's house. He also cut the tires on her friend's car because he thought Pamela went to their house. *Id.* at 500.

What the jury did not know, as explained by Dr. Smith in the 2001 trial, was Harris's mental illness, bipolar II disorder with hypomania and psychotic features, explained why he engaged in violent behavior, not only on these prior occasions

---

[20] *See Smith,* 379 F.3d at 943 (finding "the jury already had evidence of Smith's impulsiveness and lack of emotional control. What the jury wholly lacked was an *explanation* of how Smith's organic brain damage caused these outbursts of violence and caused this 'kind hearted' person to commit such a shocking crime").

described by his ex-wife, but also on September 1, 1999 at the time of the murder. There was strong evidence of mental impairment and a causal link to the crime.[21] According to Dr. Smith, Harris's "anger" and "strong emotions" were symptoms of his bipolar II disorder and hypomania, evidenced by "irritability, hostility, impulsivity, grandiosity, rapid talking, racing thoughts." He explained a hypomanic episode is "the product of an agitated brain." 2001 Tr. Vol. 15 at 208. Harris had a "hard problem interpreting reality" because he was in a "highly agitated, enraged state" that "would cause misperceptions and misinterpretation of environmental clues, or totally ignoring environmental clues." When "strong affect or feeling is generated, as was true in this case, [he] would have an especially difficult time managing and controlling [his] rage." 2001 Tr. Vol. 15 at 211-12.

In other words, the jury knew the bad news of his violent past but not the good news — that Harris's "weakness" was the product of bipolar II that in the future could likely be controlled by medication while he served a sentence of life without parole. This omitted evidence provided a credible, mitigating explanation why this "kind hearted man" engaged in violence on September 1, 1999.

---

[21] This is contrary to the weak evidence of impairment in *DeLozier v. Sirmons*, 531 F.3d 1306, 1332 (10th Cir. 2008) (noting the use of methamphetamine could cause brain damage but neuropsychological testing was negative).

### iii.   Trial Counsel Presented No Credible Explanation for Mr. Harris's Violent Behavior. There Exists a Reasonable Probability Evidence of Untreated Mental Illness Would Have Influenced the Jury's Appraisal of His Moral Culpability and Resulted in a Sentence Less than Death.

Failure to call a qualified expert denied the jury evidence of Harris's mental illness in clinical terms. Such evidence could have explained how symptoms of his mental illness affected his mental state, actions, and decision making. The crucial mitigating evidence rendered Petitioner less morally culpable and could have provided a reason for at least *one juror* to select a penalty less than death. *See Williams*, 529 U.S. at 394, 397, 399.

Without the available evidence of bipolar II disorder, counsel was left with an ineffective and incomplete argument for life based on "strong emotions," alcohol, and drugs. Counsel explained Harris knew right from wrong and "*had the power to just say no* but, in his weakness and his anger and his emotions, which weren't helped at all by his years of drug abuse, he made a decision. Irrevocable. He killed a good man." 2005 Tr. Vol. 6 at 963-64 (emphasis added). The jury already knew of Petitioner's anger and drug abuse, but they were missing an explanation for his "weakness." There was strong omitted evidence available to explain this weakness — untreated bipolar II disorder impaired his "power to just say no."

Under the ABA Guidelines, counsel breached his duty to have an expert like

Dr. Smith identify and describe bipolar II disorder and the violent symptoms of that disease and how this "untreated" illness "tends to lessen the defendant's moral culpability for the offense or otherwise supports a sentence less than death . . . not to justify or excuse the crime 'but to help explain it.'" *See* ABA Guidelines 10.7 and 10.11, reprinted in 31 Hofstra L. Rev. 913, 1055, 1060 (rev. ed. 2003). "In capital cases, [this Court] refers to the ABA Guidelines . . . in assessing those 'professional norms.'" *See Littlejohn,* 704 F.3d at 859. In November 2017, this Court decided *Littlejohn* II following remand for evidentiary hearing. This Court determined there was no effective treatment for Littlejohn's mental illness, and the evidence of his brain damage was described by this Court as "on the verge of life support." *Littlejohn II*, 875 F.3d 548, 563-65 (10th Cir. 2017). In other words, evidence of Littlejohn's mental illness was weak and treatment was unavailable — not so in this case.

The Supreme Court, in *Williams*, established counsel's duty not only to investigate and present all available mental illness evidence but also *explain* its significance to the jury.  Otherwise, the jury will be left to conclude that Petitioner's violent behavior was the product of "cold-blooded premeditation," rather than a "compulsive reaction."  The Court also found the omitted evidence of mental illness might well have influenced the jury's appraisal of his moral culpability. 529 U.S. at 398. Mr. Harris's capital jury chose a death sentence at the final step of the

66

deliberation process without knowing the compelling evidence that diminished his moral culpability.

The district court clearly erred by finding the OCCA's determination of no prejudice was neither contrary to or an unreasonable application of clearly established federal law, nor an unreasonable determination of facts. Doc.77 at 37. The district court adopted the OCCA's findings and determined that if Dr. Smith had testified, the jury would have learned he "agreed Petitioner had many of the traits of an individual with psychopathy or antisocial personality disorder." Doc. 77 at 12; 2001 Tr. Vol. 18 at 181-82, 192-93. Although Dr. Smith testified that individuals with II disorder and psychopaths have some characteristics in common, he did not agree Petitioner should be labeled as a psychopath nor should he be diagnosed as suffering from anti-social personality disorder (ASPD). *Id.* at 181-82.  Smith believed only that Petitioner had some traits of ASPD, including failure to conform to lawful behaviors, impulsivity, irritability, aggressiveness, and reckless disregard for safety of self or others. *Id*. at 181, 192-93.

But the jury already knew of his unlawful behavior, impulsivity, irritability, aggressiveness and reckless disregard for safety based on his actions during the murder and previous altercations with his wife Pamela. These behaviors are characteristics that are present in every capital case. However, when Harris's

medication was properly dispensed, his bipolar II symptoms were reduced — including the risk of violence. *Id*. at 173-74. Dr. Smith also explained the risk of future violence in prison was further reduced because his previous violent episodes involved disagreements with his wife or ex-wife — a contributing factor that is not present as he served life without parole. *Id*. at 184-85. Most importantly, on cross when asked if this "mental illness . . . somehow diminishes his responsibility for what he did," Dr. Smith explained that his diagnosis does not condone what Mr. Harris did but it explains "an additional element of *understanding of why this terrible crime happened*. And I think *the presence of mental illness and the presence of drugs and alcohol contributed to the likelihood it would happen*." 2001 Tr. Vol. 15 at 237 (emphasis added). This is the essence of capital mitigation — mental illness that explains why Harris was unable to control his anger, impulsive actions, and reckless decision to take a gun to recover his tools. This evidence was not presented for the jury's assessment of moral culpability before it selected the penalty of death.

In *Ferrell v. Hall*, 640 F.3d 1199, 1234 (11th Cir. 2011), the murders were "coldblooded, execution-style, and planned out . . . outrageously and wantonly vile." In granting relief, the Eleventh Circuit concluded the mental health evidence "would have served to *reduce the volitional nature of the crime*, as well as [petitioner's] ability to plan and act rationally." *Id.* at 1235 (emphasis added).  As a result, such

evidence would have easily and directly supported the argument for mercy and answer the repeated questions why the crimes were committed. *Id*. at 1234-35. By providing mitigation evidence of Harris's mental illness and reasons why he made reckless, impulsive decisions, trial counsel could have made Harris's actions appear less incomprehensible.

In *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), the Court held "[a] process that accords no significance to . . . the character and record of the individual offender" results in "the blind infliction of the penalty of death." *See also Wiggins*, 539 U.S. at 537 (noting there existed a "reasonable probability that at least *one juror* would have struck a different balance" based on the omitted mitigating evidence); *Abdul–Kabir v. Quarterman*, 550 U.S. 233, 252, 259 (2007) (finding omitted evidence bearing on moral culpability may well have provided one juror "an entirely different reason for not imposing a death sentence").

### 5.    Failure to Grant an Evidentiary Hearing.

The OCCA held Harris's application for evidentiary hearing and supplemental materials did not contain sufficient information to show by clear and convincing evidence there was a strong possibility trial counsel was ineffective for failing to use or identify the evidence. *Harris,* 164 P.3d at 1119.

Petitioner has alleged facts that establish he is entitled to relief, and if these

69

facts are not in dispute, Petitioner is entitled to relief without the necessity of an evidentiary hearing. *Williamson v. Ward*, 110 F.3d 1508, 1513 (10th Cir. 1997). By the terms of its opening clause, 28 U.S.C. § 2254(e)(2) applies only to prisoners who have "failed to develop the factual basis of a claim in State court proceedings." Mr. Harris has not "failed to develop," and so he is entitled to an evidentiary hearing on any contested facts. *Sallahdin v. Gibson*, 275 F.3d 1211, 1240 (10th Cir. 2002) (remanding case for evidentiary hearing because of inadequate record determining trial counsel's reasons, or lack thereof, for not presenting effective sentencing mitigation).

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). When facts are in dispute, the federal district court "must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." *Townsend v. Sain*, 372 U.S. 293, 312 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). *See also Miller v. Champion*, 161 F.3d 1249, 1254 (10th Cir. 1998) (noting when the state court does not hold an evidentiary hearing on non-record evidence proffered on direct appeal,

70

the Court is in "the same position to evaluate the factual record as [the state court] was"). "[W]hen a state court unreasonably refuses to permit 'further development of the facts' of a claim" . . . the state court has "passed on the opportunity to adjudicate [the] claim on a complete record." *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) (internal citations omitted).

The only potential issue of fact is whether trial counsel made a "strategic decision" not to present mental illness as a mitigating factor; if he made a strategic decision to use mental illness, what was his plan to introduce this evidence and why did he not use a qualified mental health expert to present this evidence? The record establishes trial counsel's so-called "different path" included offering purely hearsay evidence of mental problems through a developmental psychologist's review of medical records and psychiatric reports.

Any other determination is not supported by the record and is pure speculation. "It is thus imperative to determine trial counsel's reasons, or lack thereof," for failing to present the proffered testimony during the second-stage proceedings. *See Sallahdin,* 275 F.3d at 1240 (*citing Strickland*, 466 U.S. at 689) (noting "every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Diputed facts must be resolved at an evidentiary

71

hearing. *Anderson v. Attorney Gen. of Kansas*, 425 F.3d 853, 860 (10th Cir. 2005) (finding the purpose of an evidentiary hearing is to resolve conflicting evidence.). At a minimum, this case should be remanded on this issue for an evidentiary hearing.

## PROPOSITION THREE

**THE JURY INSTRUCTION DEFINING MITIGATING CIRCUMSTANCES GIVEN IN HARRIS'S CASE ALONG WITH THE PROSECUTION'S MANIPULATION OF IT PRECLUDED AT LEAST ONE JUROR'S CONSIDERATION OF IMPORTANT MITIGATING EVIDENCE IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

**A.     Where the Claims Were Raised.**

These claims were raised in Grounds Nine and Ten of Harris's habeas petition. Doc. 32 at 168-180.[22] The district court denied relief. Doc. 77 at 44-51.

**B.     Arguments and Authorities.**

**1.     Introduction.**

The Eighth and Fourteenth Amendments require the sentencer in a capital case "not be precluded from considering, as a *mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the

---

[22] The two grounds are subsumed within this proposition. Harris's direct appeal attorney raised the issues as one claim. *See Harris v. State*, Brief of Appellant, D-2005-117, Proposition VI at 37-43 (Okla. Crim. App. May 18, 2006). The district court acknowledged Grounds Nine and Ten were "closely related." Doc. 77 at 48 n.12.

defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). *See also Skipper v. South Carolina*, 476 U.S. 1, 4 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). A capital sentencing jury must consider and give effect to all mitigating evidence. Nothing should interfere with a defendant's ability to present any and all mitigating evidence in an attempt to save his life. *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Smith v. Texas*, 550 U.S. 297 (2007).

Harris's jury was given former Oklahoma Uniform Jury Instruction OUJI-CR (2d) 4-78, which, in pertinent part, defined mitigating circumstances as follows: "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." O.R. 1607. But pursuant to the *Lockett* line of cases, mitigating evidence is not limited to circumstances that reduce "moral culpability or blame." Thus, the language used in the instruction had the potential to mislead jurors, especially if exploited by seasoned prosecutors. Here, the limiting instruction, along with the repeated manipulation of it by an experienced capital prosecutor, created a reasonable likelihood at least one juror felt legally precluded from considering all of Harris's proffered mitigating evidence. *See Boyde v. California*, 494 U.S. 370, 380 (1990) (holding the inquiry

73

is "whether there is a reasonable likelihood that the jury . . . applied the [challenged] instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence"); *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (recognizing that due to the requirement of juror unanimity to impose a death sentence, evidence which may reasonably sway just one juror is pivotal in a capital case).

### 2. The Prosecution's Exploitation of the Infirm Instruction.

Based on the prosecution's exploitation of the limiting instruction, there is a reasonable likelihood at least one juror applied the challenged instruction in a way that prevented the consideration of Harris's constitutionally relevant mitigating evidence. Harris presented thirteen mitigating circumstances for the jury's consideration at his resentencing. O.R. 1608-1610. Eleven of these mitigators involved personal factors unrelated to the crime. Prosecutor High improperly capitalized on the limiting language of the infirm instruction in closing argument to diminish the jury's consideration of these mitigators. For example, after reciting the definition of mitigating circumstances directly from the instruction, she went on to emphasize its limiting language: "That's what a mitigating circumstance is. It extenuates or reduces the degree of moral culpability or blame of Jimmy Dean Harris for murdering Merle Taylor." 2005 Tr. Vol. VI at 929.

But Prosecutor High did not stop there. She also proposed her own two-part

74

test for considering *each* mitigating circumstance based on the limiting instruction:

> So when you look at these mitigators, decide two things. One, is it true? Is what they have listed here true? Did it really happen? And, two, if it is true, does it make a difference? Does it extenuate or reduce his culpability for the murder of Merle Taylor? *Because it's got to be both.*

*Id.* at 930 (emphasis added). Applying this test and addressing Harris's proposed mitigators, the prosecutor's argument was replete with misstatements of law regarding the proper consideration of mitigating evidence:

> One, the defendant has no prior felony or misdemeanor convictions. Okay. Fair enough. Does that somehow reduce or extenuate his degree of moral culpability?

*Id.* at 929-30.

> So ask yourself, is it true? It's true. Two, does it reduce his degree of responsibility for the murder of Merle Taylor, the fact that he hasn't beaten up anybody else since he's been in the Department of Corrections.

*Id.* at 931.

> Okay, Maybe he was abused. How many people in the world are abused and how many of them grow up to be murderers? How does one equal the other? And does that fact that he was abused as a child mitigate, extenuate, his degree of responsibility on September the 1st, 1999? . . . How does that extenuate or reduce his degree of culpability?

*Id.* at 939.

> When Jimmy Dean Harris was a teenager, his mother died of cancer. She was the one adult in his life who consistently loved him. True. True, I guess. . . . That's unfortunate, but that's something that happens to a lot

75

of people, and they don't go out years later and kill somebody. Do they get to go out years later, kill somebody, and then go, oh yeah, but my mom died when I was a teenager? How does it reduce his degree of culpability? It doesn't. It does not.

Then it says, in addition, you may decide that other mitigating circumstances exist and, if so, you should consider those circumstances, as well. Well, I submit to you, . . . some of these things may be true, but they don't mitigate because what it's got to mitigate is September the 1st of 1999. That's what it has to mitigate. It has to somehow reduce his culpability for murdering Merle Taylor.

*Id.* at 939-40.

After attacking some of the individual mitigators with her improperly limiting two-part test based on the jury instruction, Prosecutor High emphasized that *each and every one* of Harris's mitigators failed the test:

If you took *every one* of these mitigating circumstances and you said, uh-huh, that happened, it doesn't change, it doesn't mitigate, it doesn't reduce his responsibility for what he did on September 1st of 1999.

*Id.* at 941 (emphasis added). The message from the State could not have been clearer to the jury: Not one mitigating circumstance presented by Harris extenuated or reduced his degree of moral culpability or blame. Therefore, according to the prosecution, such proffered evidence failed, under the law, to satisfy the definition of mitigating circumstances provided in the jury's instructions.

### 3.     Treatment by the Lower Courts.

On direct appeal, the OCCA was "troubled . . . by the consistent misuse of the language in th[e] instruction" by prosecutors. *Harris,* 164 P.3d at 1114. The court noted it never intended "to suggest that prosecutors could . . . argue that evidence of a defendant's history, characteristics or propensities should not be considered as mitigating simply because it does not go to his moral culpability or extenuate his guilt. *This would be an egregious misstatement of the law.*" *Id.* (emphasis added). Although the OCCA ultimately found OUJI-CR (2d) 4-78 was "not legally inaccurate, inadequate, or unconstitutional," it nonetheless referred the instruction to the Oklahoma Uniform Jury Committee for repairs to "discourage improper [prosecutorial] argument." *Id.* The court suggested revisions squarely directed to solve the problem it identified.[23]

With respect to Prosecutor High's repeated exploitation of the vulnerable instruction, the OCCA found "[o]ne prosecutor did consistently argue in closing that jurors should not consider Harris's second stage evidence as mitigating, since it did

---

[23] The Committee produced an instruction precisely along the remedial lines suggested by the OCCA. The revised instruction provides, in pertinent part: Mitigating circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty. OUJI-CR (2d) 4-78 (Supp. 2008).

not extenuate or reduce his guilt or moral culpability. This argument improperly told jurors not to consider Harris's mitigating evidence." *Id.* at 1113. Although the OCCA characterized this type of argument as "an egregious misstatement of the law," it ultimately concluded Prosecutor High's improper argument was harmless, having been ameliorated by the jury instructions as a whole and by Prosecutor Lane's final closing wherein he ostensibly "invited jurors to consider all Harris's mitigating evidence, weigh it against the aggravating circumstances, and find that the death penalty was appropriate." *Id.* at 1113-14.

On federal habeas, the district court, applying *Boyde*, concluded the instruction given in Harris's case "did not limit the jury's consideration of the evidence presented in support of the mitigating circumstances." Doc. 77 at 47. The court further found that "[e]ven if the instruction was improper, Petitioner has not shown that the error so infected the entire sentencing trial that it violated due process." *Id.* at 48. As a result, the district court concluded the OCCA's determination was not contrary to or an unreasonable application of clearly established Supreme Court law. *Id.* With respect to the prosecutor's argument exploiting the limiting instruction, the court found Harris failed to demonstrate the prosecutor's misconduct denied him a specific constitutional right, *id.* at 49, and "did not so infect the trial with unfairness as to make the resulting [sentence] a denial of

due process." *Id.* at 50. Therefore, the district court concluded the prosecution's argument along with the limiting jury instruction did not prevent the jury from considering evidence in support of Harris's mitigating circumstances. *Id.* at 51.

### 4. The District Court Erred by Endorsing the OCCA's Unreasonable Decision.

#### i. The Constitutionality of the Instruction.

This Court has held that, given other Oklahoma jury instructions, the infirm instruction at issue here does not violate the Constitution. *Hanson v. Sherrod*, 797 F.3d 810, 851-52 (10th Cir. 2015); *Grant v. Royal*, 886 F.3d 874, 934-35 (10th Cir. 2018). Harris acknowledges *Hanson* and *Grant* may bind this panel concerning the constitutionality of the instruction in an "indistinguishable case." *Fairchild v. Trammell*, 784 F.3d 702, 715 (10th Cir. 2015). That acknowledged, Harris respectfully persists in presenting his concerns about the instruction, to at a minimum, preserve them for further review. Further, the egregious prosecutorial manipulation of the instruction here distinguishes Harris's case from *Hanson* and *Grant*.

The Supreme Court has held the remedial measures state courts perform are at least some indicia the prior instructions were infirm. *Mills v. Maryland*, 486 U.S. 367, 382 (1988). In *Hanson*, this Court rejected the *Mills*-based inference of an

infirmity in the unimproved instruction. The Court did so because of "[t]he OCCA's explanation as to why it amended the instruction." *Hanson*, 797 F.3d at 851. Although the OCCA proclaimed the instruction it ordered revised was sound, the OCCA also said the instruction needed clarification and revision to "discourage improper [prosecutorial] argument." *Harris*, 164 P.3d at 1114. The OCCA's pronouncements are internally inconsistent; the pronouncements are also factually and legally unreasonable. A sound instruction would not be so subject to prosecutorial abuse. The infirmity is better illustrated here than in *Hanson* and *Grant*.

Further, as the Supreme Court's teaching in *Mills* itself reflects, actions speak louder than words. Prior to *Mills* reaching the Supreme Court, the Maryland Court of Appeals had found the instruction and verdict form constitutionally sound. *Mills*, 486 U.S. at 371-72. The Supreme Court even found this assessment "plausible." *Id.* at 377. However, the Maryland court's plausible assessment did not stop the Supreme Court from drawing a very different inference from the subsequent repair of the claimed constitutional problem.

The OCCA's actions also speak far louder than its internally inconsistent and thus unreasonable endorsement of the instruction as constitutionally sound. Judge Moritz recently recognized as much in her dissenting opinion in *Grant*:

80

As the OCCA did in *Harris*, 164 P.3d at 1113-14, the Maryland Court of Appeals rejected the defendant's argument but then changed the uniform instruction. The Supreme Court took this into account when it concluded that the former instructions were impermissibly misleading, explaining that the Court "infer[red] from these changes at least *some* concern on the part of [the Maryland Court of Appeals] that juries could misunderstand the previous instructions as to unanimity and the consideration of mitigating evidence by individual jurors."

. . . .

. . . I see little difference between the Maryland Court of Appeals' decision to change its jury instruction and the OCCA's decision to change [OUJI-CR(2d) 4-78].

*Grant*, 886 F.3d at 962 n.2 (Moritz, J., dissenting) (citations omitted). The OCCA's approval of this instruction was an unreasonable application of and contrary to *Mills*, *Boyde*, and *Lockett*, and the district court erred by endorsing such view.

## ii. Prosecutorial Misconduct.

Typically, when a petitioner alleges prosecutorial misconduct, the question to be resolved is whether the actions "so infected the [sentencing] with unfairness as to make the resulting [penalty] a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). But here, because the prosecution's arguments impermissibly infringed a specific constitutional right – namely the right to present mitigation[24] – Harris need not show

---

[24] There is little else in Eighth Amendment jurisprudence so critical as the death-qualified jurors' understanding they can consider and give effect to *any* aspect of a defendant's character or record in their decision to recommend life or death. This is a "constitutionally indispensable part of the process of inflicting the penalty of

his entire sentencing proceeding was rendered unfair by the prosecution's improper argument. *Paxton v. Ward*, 199 F.3d 1197, 1217-18 (10th Cir. 1999). In any event, the lower courts' failure to recognize and accord the proper scrutiny was an unreasonable application of and contrary to clearly established Federal law, thereby satisfying § 2254(d)(1).

Further, the OCCA's determination Prosecutor High's improper argument, which was an "egregious misstatement of the law," was somehow cured by the final closing of Prosecutor Lane is an unreasonable determination of fact. § 2254(d)(2). Contrary to the OCCA's assertion, Prosecutor Lane did not "invite[] jurors to consider all Harris's mitigating evidence." *Harris*, 164 P.3d at 1113-14. Nowhere in Prosecutor Lane's final closing argument did he do such thing. 2005 Tr. Vol. VI at 968-83. At one point, Prosecutor Lane stated the following:

> I'm asking you to make a decision that I believe is based upon principal [sic], to examine the evidence, determine whether you believe beyond a reasonable doubt one or both of these aggravators are in existence, and . . . then to make a determination of whether these - - these mitigation issues that Mr. Rowan has brought up really override that day of terror.

*Id.* at 982-83. This statement in no way "invited the jurors to consider all of Harris's mitigating evidence," nor did it ameliorate the drumbeat of Prosecutor High's relentless exploitation of the infirm instruction.

---

death." *Woodson,* 428 U.S. at 304 (plurality opinion).

Harris's case does not have the safeguard of prosecutorial encouragement this Court found ameliorative in *Hanson*. *Hanson*, 797 F.3d at 851 (noting the prosecutor "made a number of other comments to the jury that encouraged them to consider any and all mitigating evidence"). Nor do the facts of this case mirror the limited instances of prosecutorial manipulation found in *Hanson*. *Id.* (noting only one instance where prosecutor told jury to consider whether any of the mitigating circumstances "really extenuate or reduce [Hanson's] degree of culpability or blame"). Here, there were no arguments by the prosecution to consider all of the mitigating circumstances. A review of the case as a whole reveals no allowances for a broader perspective on mitigation. Instead, Prosecutor High repeatedly limited the jury's consideration to reducing moral culpability for the offense, presenting this as law and hammering it into the jurors' heads over and over again. This was done specifically for each and every proffered mitigating circumstance, all in contravention of *Lockett* and its progeny.

Nor does Harris's case have the "corrective effects" of unchallenged prosecutorial argument identified by this Court as ameliorative in *Grant*, 886 F.3d at 942. There, one of the prosecutors "spent the lion's share of her time casting doubt on the veracity, credibility, and weight of the evidence supporting the mitigating circumstances," and "never questioned whether those circumstances qualified under

83

the law as mitigating evidence." *Id.* at 942-43. This Court concluded such arguments created an inference to the jury that all of the mitigating evidence was legally proper. *Id.* at 943.

Here, Prosecutor Lane's final closing had no "corrective effect" to mitigate Prosecutor High's egregiously improper argument. Instead, he spent most of his argument attempting to convince the jury of the aggravated nature of the murders, 2005 Tr. Vol. VI at 962-73, 974-78, minimizing the unfortunate circumstances of Harris's life as mere components of the "[p]ortrait of murderers," *id.* at 973, and extolling the virtues of Merle Taylor, *id.* at 979-81. Without the "corrective effect"of argument like that in *Hanson* and *Grant*, Harris's jury was left only with Prosecutor High's command that to qualify as a mitigating circumstance under the law, such circumstances must extenuate or reduce Harris's guilt or moral culpability. Such argument, in conjunction with the flawed jury instruction, surely constrained at least one juror's consideration of Harris's mitigation. Any determination otherwise is both factually and legally unreasonable.

Further, Harris's jury was not given an instruction found to be critically ameliorative in *Grant*. In *Grant,* this Court stressed the jury was instructed that the instructions as whole, "contain all the law and rules you must follow." *Grant*, 886 F.3d at 941. The Court concluded this instruction "would have tended to make it less

reasonably likely that the jurors would have 'applied [OUJI-CR (2d) 4-78] in a way that precluded them from considering mitigating evidence.'" *Id.* at 942. Harris's jury received no such instruction, O.R. 1597-1619, and as a result, Prosecutor High's egregious argument had a much more likely effect of militating in favor of preclusion.

In determining whether the improper prosecutorial argument operated to preclude at least one juror from considering Harris's mitigation, this Court should consider this is one of many cases in which Oklahoma prosecutors, particularly those from Oklahoma County, employed this moral culpability argument. *See Simpson v. Royal*, Case No. 16-6191, Appellant's Opening Brief at 79-86 (10th Cir. May 31, 2017); *Simpson v. State*, 230 P.3d 888, 903-04 (Okla. Crim. App. 2010); *Cuesta-Rodriguez v. Royal*, Case No. 16-6315, Appellant's Opening Brief at 55-71 (10th Cir. Nov. 15, 2017); *Cuesta-Rodriguez v. State*, 241 P.3d 214, 241-43 (Okla. Crim. App. 2010). And Oklahoma prosecutors' exploitation has continued despite the revised instruction. Proceeding unabated, prosecutors continue to argue jurors cannot consider evidence as mitigating unless it extenuates the defendant's moral culpability or blame for the murder. *See Harmon v. Royal*, Case No. 16-6360, Appellant's Opening Brief at 55-62 (10th Cir. May 7, 2018); *Harmon v. State*, 248 P.3d 918, 943-44 (Okla. Crim. App. 2011); *Johnson v. Royal*, Case No. 16-5165, Appellant's

Opening Brief at 36-57 (10th Cir. Feb. 26, 2018).

Experienced capital prosecutors have set a great value on the mitigation boundary. The majority opinions in *Hanson* and *Grant* never addressed why such prosecutors serially make the moral culpability argument in case after case, even after being warned not to. The logical conclusion is they make the argument because it works. *See Dodd v. Trammell*, 753 F.3d 971, 977 (10th Cir. 2013) (declining to "impugn the expertise of a very experienced and highly successful prosecutor, whose firsthand knowledge of Oklahoma capital juries far exceeded what we could possibly acquire").  Here, Prosecutor High repeatedly told the jurors that to be mitigating, such circumstances must extenuate or reduce the degree of moral culpability or blame of Harris for murdering Merle Taylor. No doubt at least one juror believed it. After all, "the average jury . . . has confidence . . . [in] the prosecuting attorney." *Berger v. United States*, 295 U.S. 78, 88 (1935).

## C.    Conclusion.

This Court may be limited to *Hanson* and *Grant* as to the challenged instruction itself.  However, the Court is not limited as to the prosecutor's repeated egregious argument wherein she exploited the infirm instruction. The OCCA's decision was unreasonable as to both law and fact, and the district court erred by determining otherwise. The Court should reverse with directions to grant the Writ.

86

## PROPOSITION FOUR

**IMPROPER VICTIM-IMPACT TESTIMONY, INCLUDING REQUESTS FOR DEATH, HAD A SUBSTANTIAL AND INJURIOUS EFFECT ON THE SENTENCING VERDICT; IN THE ALTERNATIVE, SUCH REQUESTS CONSTITUTE STRUCTURAL ERROR.**

**A.    Where the Claim Was Raised.**

This claim was raised in Proposition Eleven of Harris's habeas petition. Doc. 32 at 180-86. The district court denied relief. Doc. 77 at 51-54.

**B.    Exhaustion and Standard of Review.**

This issue was presented in Proposition Seven of the 2005 direct appeal, and the OCCA denied relief. *Harris*, 164 P.3d at 1110.  The OCCA refused to reconsider its many prior decisions that violate *Booth v. Maryland*, 482 U.S. 496, 502-03 (1987), and again held that family members of the victim may recommend death in a capital sentencing trial. *Harris,* 164 P.3d at 1110 n.22 (citing *DeRosa v. State*, 89 P.3d 1124, 1151-52 (Okla. Crim. App. 2004)).  The OCCA made no attempt to reconcile *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), where the Court explicitly did *not* overrule the portion of *Booth*, which held unconstitutional "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Payne*, 501 U.S. at 830 n.2.

Harris also challenged the family's "characterizations and opinions" in post-

conviction proceedings through a claim that trial and direct appeal counsel were ineffective for failing to challenge the family's statements presented by Prosecutor Lane, who virtually recited word for word the victim-impact statements during his closing argument. APCR at 40. The OCCA held, however, the victim-impact statements were proper and Harris failed to show prosecutorial argument deprived him a fair and reliable resentencing. *Harris*, 167 P.3d at 443-44. If this Court questions whether "characterizations and opinions about the crime" are fully exhausted, it is clear the OCCA would have denied the issue – as made clear in *DeRosa* and at least ten other cases – so further presentation or exhaustion would be futile. *Goodwin v. Oklahoma,* 923 F.2d 156 (10th Cir. 1991).

Although Respondent[25] and the district court have acknowledged this error, the district court found the error harmless. Doc. 77 at 51-54. Notably, the OCCA did not acknowledge the error and did not review for harmlessness on post-conviction or direct appeal. *Harris,* 164 P.3d at 1110; *Harris*, 167 P.3d at 443-44. The OCCA's decision is contrary to *Booth*, as confirmed by *Bosse v. Oklahoma*, 137 S.

---

[25] On direct appeal, Respondent dismissed the supremacy of Supreme Court decisions by noting the OCCA "need not reconsider its long-settled decision that such sentence recommendations by victims are constitutionally admissible." *Harris v. State*, Case No. D-2005-117, Brief of Appellee at 40, (Okla. Crim. App. July 25, 2006).

Ct. 1, 2 (2016) (*per curiam*),[26] and the harmfulness of the error must be reviewed de

novo.  *See Fairchild v. Workman*, 579 F.3d 1134, 1140 (10th Cir. 2009) (finding

appellate court reviews district court's conclusions de novo when the state court does

not determine the issue on the merits).

## C.    Constitutional Error Ignored.

In *Selsor v. Workman*, 644 F.3d 984, 1026-27 (10th Cir. 2011), and in at least

nine other cases, this Court found family's death pleas harmless by applying *Brecht

v. Abrahamson*, 507 U.S. 619, 637 (1993). In *Dodd v. Trammell,* 753 F.3d 971 (10th

Cir. 2013) that changed – there, the *Booth* error was not harmless.[27] In *Dodd*, this

Court noted Oklahoma prosecutors have persistently pursued what was allowed

---

[26] In *Bosse*, on remand from the Supreme Court, the OCCA determined the victims' family's requests for death were harmless. The jury found the murders of the three victims each to be heinous, atrocious, and cruel and they were murdered to avoid arrest. Bosse killed his girlfriend and her two children. All three were stabbed and possibly burned alive. Additionally, fourteen defense witnesses asked to spare Bosse's life. *Bosse v. State*, 400 P.3d 834, 857-58 (Okla. Crim. App. 2017).

[27] Prior to granting the Writ in *Dodd,* this Court found at least 10 times that family's death pleas, which violated *Booth,* were harmless. *Id.* at 997-98 (citing *Grant v. Trammell*, 727 F.3d 1006, 1015-17 (10th Cir. 2013); *Lockett v. Trammell*, 711 F.3d 1238-40 (10th Cir. 2013); *Lott v. Trammell*, 705 F.3d 1167, 1214-19 (10th Cir. 2013); *DeRosa v. Workman*, 679 F.3d 1196, 1236-37, 1240 (10th Cir. 2012); *Selsor*, 644 F.3d at 1025-27; *Welch v. Workman*, 639 F.3d 980, 1000-04 (10th Cir. 2011); *Welch v. Sirmons*, 451 F.3d 675, 703-04 (10th Cir. 2006); *Hooper*, 314 F.3d at 1174; *Willingham v. Mullin*, 296 F.3d 917, 930-32 (10th Cir. 2002); *Hain v. Gibson*, 287 F.3d 1224, 1236-1240 (10th Cir. 2002).

under Oklahoma law and ignored what was prohibited by the Constitution. And this was true.

When Petitioner's case was re-tried in 2005, *Hooper, Willingham,* and *Hain* had been decided by the Tenth Circuit and *Welch (Frank)* by the district court. On the heals of these cases, both *Dodd* and *Harris* were prosecuted during the tenure of Wes Lane, former Oklahoma County District Attorney. In 2005, when Lane elicited the victim-impact evidence in this case, he ignored the fair warning that a family's death pleas violated the Constitution and wittingly violated his oath while hiding behind harmless error. Under these circumstances, the error is not harmless and is structural as will be discussed.

In *Dodd*, this Court held the actions of the prosecutor highlighted the materiality of death pleas by victims' family members. Lane believed requests for death to be so critical to obtaining a death sentence he was willing to run the risk of Constitutional reversible error. 753 F.3d at 997. The prosecutor also compounded the prejudice from the victim-impact statements by including them as the centerpiece of his final closing argument. "For this Court to decide that such testimony did not have a substantial effect on the jury would be to impugn the expertise of a very experienced and highly successful prosecutor, whose firsthand knowledge of Oklahoma capital juries far exceeded what we could possibly acquire." *Id.*

Prosecuted under Lane, the facts and circumstances in Harris's case are at least equally prejudicial, if not more so, than in *Dodd*. Therefore, the *Booth* error is not harmless.

### 1.    Mr. Harris's Case is Far Less Aggravated than *Dodd*.

The evidence for the death penalty in Harris's case is significantly weaker than in *Dodd*. Dodd was convicted of the malice aforethought killing of two people by cutting their throats with a large hunting knife. His jury found two aggravating circumstances for each murder: 1) the previous conviction of a felony involving violence to the person (Dodd beat and robbed a 77-year-old woman in her home with a dangerous weapon); and 2) knowingly creating the great risk of death to more than one person. 753 F.3d at 981.  The record also showed he "robbed a paperboy at knife point when he was a juvenile." *Dodd v. State*, 100 P.3d 1017, 1050 (Okla. Crim. App. 2004).  Dodd's victims' throats were cut ear to ear, and they were left lying side by side, face down in a pool of blood. The butcher knife Dodd used cut through their tracheas and carotid arteries reaching their spines. *Id.* at 1024. Seven family members asked Dodd be put to death. 753 F.3d at 995.

In Harris's case, the jury found two aggravating circumstances: 1) the defendant knowingly created a great risk of death to more than one person; and 2) constituted a continuing threat to society. *Harris*, 164 P.3d at 1107. Harris's

91

resentencing judge viewed the case for death as weak:

> It was a domestic homicide. Unfortunately, we see a lot of those. But if he would have just shot her it wouldn't have been a Bill [of Particulars] case, no priors . . . didn't hurt anybody else, domestic deal,[28] long-term argument, all of the things that go into that. It wouldn't be a Bill case. We wouldn't be here.

2005 Tr. Vol. 5 at 16. Merle Taylor's son, Toby, and his wife, Carolyn, both concluded their testimony with requests for death. 2005 Tr. Vol. 4 at 891, 900-01.

In *Dodd*, three separate times the OCCA described the proof of the aggravating circumstances as "overwhelming." 100 P.3d at 1044. And the court went on to reference "the nature of the double murder itself." *Id.* at 1047. In contrast, however, the *Harris* court used the term "*overwhelm*" only once — that Harris "was overwhelmed by the powerful emotions of anger and fear of life without Pam Harris." *Harris*, 164 P.3d at 1119-20 n.68.

And while the juries found the great risk of death aggravator in both cases, Mr. Dodd killed two people by slicing their throats with a butcher knife. Harris shot and killed Mr. Taylor, who was protecting Harris's wife Pamela, and then shot and wounded Pamela, subsequently beating her with his empty pistol. Further, in *Dodd*, "unlike seven of [the OCCA's] precedents, the jury did not find the aggravating

---

[28] Neither Harris nor his counsel adopts the trial judge's description minimizing the criminality of domestic abuse. However, the State's description of Harris's actions pales in comparison to the gruesome murders in *Dodd.*

circumstance that the murder was 'especially heinous, atrocious, or cruel.'"[29] 753
F.3d at 998. In Harris's case, the HAC aggravator was not even alleged by the
prosecution. O.R. 41. Although Harris, like the petitioner in *Dodd,* was found to be
a continuing threat,[30] this was based on unadjudicated instances of emotionally
charged domestic violence, 2005 Tr. Vol. 3 at 490-92, 497-500, 506-10, and one
incident of getting into a fight with a jail officer when Harris's medications were
possibly not dispensed properly. 2005 Tr. Vol. 4 at 836-70. These unadjudicated
crimes do not rise nearly to the level of the prior violence committed by the
petitioners in *Hain*, *Welch,* and *Dodd*.

   *Selsor v. Workman*, 644 F.3d 984, 990 (10th Cir. 2011), is the only "*Booth*"
case where the jury did not find either the HAC or the continuing-threat aggravator.
However, unlike *Harris* (and *Dodd*), the two *Selsor* victim-impact statements "did
not expressly refer to [the defendant] being put to death"; instead, they both simply
stated they agreed with the prosecution's "recommended sentence." *Id.* at 1027.
Therefore, *Selsor* is easily distinguishable. Indeed, the circumstances of the *Selsor*
murder demonstrated evil intent in his premeditation – a pact with his co-defendant

---

   [29] This was very fortunate for Mr. Dodd because these "knife wounds were
some of the worst [the medical examiner] had ever seen." 100 P.3d at 1041.

   [30] So too did the juries in *Grant*, 727 F.3d at 1017 and *Hooper v. Mullin*, 314
F.3d 1162, 1167 (10th Cir. 2002).

that they were not leaving any witnesses and his "role in a string of violent robberies

. . . that weighed heavily in favor of imposition of the death penalty." *Id.*

Review of the evidence in Harris's case shows a much different story than the

cases wherein this Court found the error to be harmless. Here, there was significant

evidence concerning Harris's strong emotions and anger when he made the decision

to take a gun to the transmission shop to confront his wife and recover his tools.

According to the OCCA, the jury knew he was mentally ill. *Harris,* 164 P.3d at

1117.

### 2.    Incompatibility with Oklahoma's Scheme.

The Oklahoma scheme requires a weighing of valid aggravating circumstances

and mitigating evidence.  Okla. Stat. tit. 21, § 701.11. This weighing scheme does

not contemplate the inclusion of victim-impact statements. Victim-impact evidence

is not relevant to either aggravation or mitigation and negates the narrowing function

required under Supreme Court jurisprudence, thereby skewing the results in

Oklahoma's weighing process.

Here, the jury instructions told Harris's jury not to consider the victim-impact

evidence until at least one aggravating factor was proven and until it was determined

the aggravating factors outweighed the mitigating factors. O.R. 1616-17.  The jurors

were instructed it then was proper to consider it "in determining the appropriate

94

punishment." O.R. 1617. However the jury's "consideration must be limited to *a moral inquiry into the culpability of the defendant,* not an emotional response to the evidence." O.R. 1616 (emphasis added). The jury's death decision was skewed by the irrelevant victim-impact statements and pleas for death. How were the impassioned pleas for death from Mr. Taylor's wife and son relevant to this "moral inquiry" into Harris's culpability to determine "the appropriate sentence"? Moreover, how can an emotional plea for death not result in an emotional response? Isn't that what Lane was seeking by repeating Mrs. Taylor's plea for death at the end of his argument?

The Fourteenth Amendment mandates all persons are entitled to due process and equal treatment under the law. Mr. Taylor was undoubtedly a very good man. Would Harris be less morally culpable if he killed a lesser man, such as a homeless man with less social status or a person with black, brown, or yellow skin? Available empirical data establishes that "social status" is a prevailing factor in deciding life or death.[31]  In Harris's case, this turns the focus of the selection of penalty based on

---

[31] A 2009 study finds that the social status of the murdered victim has a significant influence on whether the death penalty is sought and imposed on the defendant. Defendants are six times more likely to receive a death sentence if they kill the highest status victims (whites or Hispanics who have college degrees, are married, and have no criminal record), compared to those defendants who kill the lowest status victims (black or Asian victims who are single, with a prior criminal record, and no college degree).  Scott Phillips, *Status Disparities in the Capital of Capital*

95

"moral culpability" into a popularity contest that Harris could never win. The Taylor family's requests for death and their descriptions of Mr. Taylor's character are the underpinnings of this unconstitutional result. Indeed, this is the very reason such pleas are to be excluded.

Toby Taylor, Mr. Taylor's son, pled "[o]n behalf of myself, my entire family, I respectfully ask that you impose the maximum allowable punishment and, in my mind, the only acceptable punishment, and sentence Jimmy Dean Harris to death. Thank you." 2005 Tr. Vol. 4 at 891. His wife, Carolyn Taylor, stated:

> I wrestle every day with the question of why *such a good man was gunned down*, how many lives have been irreparably changed forever,
>
> . . . .
>
> It grieves me that my husband went to his grave not knowing why he had to die. My sons, grandchildren, and I ask you to sentence Jimmy Dean Harris to death.

*Id*. at 900-01 (emphasis added). How could one juror even consider turning her down?

*Booth* was decided 31 years ago to prevent a capital jury from considering these irrelevant victim statements and requests for death, noting that a victim's family's death pleas "may be wholly unrelated to the blameworthiness of a particular defendant," and may cause the sentencing decision to turn on factors irrelevant to the

---

*Punishment*, 43 Law and Society Review 807 (2009).

"decision to kill" and on irrelevant factors about which the defendant was unaware, such as the relative worth of the victim's character. *Booth,* 482 U.S. at 503-05. More than likely the jurors, who chose between life and death, identified with Mr. Taylor rather than Harris in this "us versus them" contest.

The State encouraged this result in the first closing argument: "[Harris] can solve problems. He just doesn't solve them in a way that *we* think is appropriate. . . . It's *the rest of us* that need to fear him for his problem-solving abilities." 2005 Tr. Vol. 6 at 935 (emphasis added). In his final closing, Prosecutor Lane repeated almost verbatim the statements of Mr. Taylor's son and wife, *id.* at 980-82, including when Mrs. Taylor said, "I wrestle every day with the question of why *such a good man* was gunned down. He never hurt anyone. Why was he murdered?" (emphasis added). The *Booth* error was compounded by the prosecution's argument repeating the victim-impact statements. *Id.* at 981.

Any consideration of other factors such as the comparative value of Harris and Mr. Taylor's lives must be scrutinized to ensure the evidence had some bearing on the defendant's "personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801 (1982). Yet this evidence had no probative value at all and was more prejudicial than probative. *See* Okla. Stat. tit. 12, § 2403 (2001). The testimony and argument created the risk the death sentence would be based on considerations that

are "constitutionally impermissible or totally irrelevant to the sentencing process."

*See Zant v. Stephens*, 462 U.S. 862, 885 (1983).

**D.      This Error Was Far From Harmless.**

The family requests for death inflamed the passions of the jury and improperly invoked sympathy resulting in a sentence of death based on emotion. When prosecutors play on jurors' passions, it can only subvert the delicate process of preventing the arbitrary imposition of the death penalty, something with which the courts have long struggled. *Coleman v. Brown,* 802 F.2d 1227, 1241 (10th Cir. 1986).

In applying the harmless-error analysis under *Brecht,* the district court doubted "the witnesses' concisely stated opinions had much inflammatory impact compared to the nature of the murder, the strength of the state's case, and the extensive evidence supporting the aggravating circumstances." Doc. 77 at 54. However, the Supreme Court's holding in *Booth* indicates a violation should rarely, if ever, be found harmless:

> [T]he formal presentation of this information by the State can serve *no other purpose than to inflame the jury* and divert it from deciding the case on the relevant evidence concerning the crime and the defendant. . . . The admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases.

98

*Booth*, 482 U.S. at 508-09 (emphasis added). "Only the most callous individual would be unaffected by a plea from a woman whose parents were brutally murdered. This is the reason such testimony is not permitted by the Constitution, and it is the reason Oklahoma prosecutors continue to elicit such statements." *DeRosa v. Workman*, 696 F.3d 1302(Mem), 1306 (Lucero, J., dissenting).

Here, the death recommendations came from the most sympathetic of victims — Mr. Taylor's grieving spouse and son and on behalf of his grandchildren. The witnesses' unconstitutional opinions on the sentence to be imposed and Toby Taylor's unconstitutional characterization of why death was appropriate likely had an exponential effect on any one juror. Because the verdict must be unanimous, Okla. Stat. tit. 21, § 701.11, the profound impact of this unconstitutional victim-impact testimony cannot be underestimated.

**E.    Structural Error.**

More than one judge from this Court has indicated sentencing recommendations by victim's family members may rise to the level of structural error requiring automatic reversal. *Hain*, 287 F.3d at 1239 n.11;[32] *DeRosa*, 696 F.3d at 1305 (Lucero, J., dissenting) (noting "[w]hen the highest court in a state has adopted

---

[32] Notably, in *Hain*, the OCCA determined *Booth* errors were subject to harmless-error review, whereas here, the OCCA made no such finding because it did not consider constitutional error and made no finding.

a practice that violates the Constitution 'beyond any possibility for fairminded disagreement,' we are plainly faced with a 'structural' defect as that word is ordinarily used") (citation omitted).

Given that the OCCA in 2006 and prosecutors in 2005 continued to embrace the very victim-impact evidence precluded by *Booth* 18 years before, reveals the importance and affect the same had on the integrity of Harris's sentencing trial. The prosecutor's intentional and premeditated admission of the Taylor family's pleas for death amounted to structural error. In the unusual case, where the constitutional error is both *flagrant and repetitive*, no harm need be shown. *Brecht,* 507 U.S. at 638 n.9. That pattern exists here. The repetitive refusal of the OCCA to apply *Booth* and the prosecutors' refusal to follow it present an exceptional circumstance requiring automatic reversal.

In *Brecht*, the Court contemplated as much: "[A] deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *Id*.; *see also Fry v. Pliler*, 551 U.S. 112, 117 (2007) (acknowledging exception to *Brecht* harmless error rule). The OCCA, state trial judges, and prosecutors have repeatedly and deliberately violated capital defendants' Eighth

100

Amendment rights by permitting victim's family members to plead for death. Lane made these statements the centerpiece of his closing argument and the last thing the jury heard before retiring to deliberate. It is difficult to imagine a more intentional or prejudicial assault on Harris's right to fair sentencing proceeding.

Even without structural error, however, if this "court is in virtual equipoise as to the harmlessness of the error under the *Brecht* standard, the court should treat the error as if it affected the verdict." *Dodd,* 753 F.3d at 997 (citing *Fry*, 551 U.S. at 121 n.3.This Court should remand to the district court with orders to issue the Writ.

## PROPOSITION FIVE

**THE ACCUMULATION OF ERRORS VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

**A.    Where the Claim Was Raised.**

This claim was raised in Ground Fourteen of Harris's habeas petition. Doc. 32 at 238-42. The district court denied relief. Doc. 77 at 64-65.

**B.    Arguments and Authorities.**

Accumulation of error was raised in the 2005 direct appeal as Proposition Twelve. The OCCA found error in Proposition Three, which addressed the failure to bring the jury into open court when a question was presented in deliberations; that error was determined harmless. Error was also found for Proposition Six addressing

the jury instruction on mitigating circumstances, which unconstitutionally limited the jury's ability to consider mitigating evidence, and the prosecutor's exploitation of such instruction. The OCCA held "taken together, these errors do not require relief." *Harris,* 164 P.3d at 1119. In 2005 post-conviction proceedings, Petitioner also requested cumulative review of error. The OCCA held "[t]here is no cumulative error to consider." *Harris*, 167 P.3d at 445.

The district court denied relief, finding the cumulative effect of the direct appeal errors "did not significantly strengthen the state's case or diminish Petitioner's case. No reasonable probability exists that the jury would have sentenced Petitioner differently absent the errors." Doc. 77 at 65. This decision was erroneous.

This Court's cumulative-error review is not restricted by § 2254(d)(1)'s limited focus. "There is an antecedent state court decision on the same matter," so this Court must "approach the question of cumulative error as . . . prior to AEDPA's passage." *Cargle*, 317 F.3d at 1206. Accordingly, review of the OCCA and district court denial is de novo.

The Supreme Court recognized cumulative error in *Chambers v. Mississippi,* 410 U.S. 284 (1973), and *Taylor v. Kentucky*, 436 U.S. 478 (1978). In *Chambers*, the Court described how the net effect of multiple errors can deprive a criminal defendant of due process. *Chambers*, 410 U.S. at 298. In *Taylor*, the Court expressly

102

described the aggregate impact of multiple harmless errors as "cumulative." *Taylor*, 436 U.S. at 487 n.15.

In *Wilson v. Sirmons*, 536 F.3d 1064, 1122 (10th Cir. 2008),[33] this Court determined"[a] cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of trial is such that collectively they can no longer be determined to be harmless." *Id*. (quoting *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990)).

Each of these Constitutional issues[34] are grounded in the well-developed principles of the Eighth Amendment and the promise of the effective assistance of counsel of the Sixth Amendment. Cumulatively, Mr. Harris was denied a fundamentally fair trial under the Fifth Amendment.

---

[33] In *en banc* review this Court reinstated the panel decision in *Wilson,* and remanded *Wackerly* to the panel for disposition. *Wilson v. Workman,* 577 F.3d 1284 (10th Cir. 2009).

[34] Petitioner was not granted a COA on the mitigating effect of "borderline" intellectual disability. Properly presented impaired intellectual functioning also has a mitigating dimension beyond the impact it has on the individual's ability to act deliberately. *Tennard v. Dretke*, 542 U.S. 274, 288 (2004) (citing *Penry I*, 492 U.S. at 322). *See also Atkins*, 536 U.S. at 318. *See also Motion for Modification* filed January 16, 2018.

The failure of trial counsel to present evidence of Mr. Harris's *untreated* bipolar II disorder deprived his jury of an explanation as to why not only a "good man" shot and killed Mr. Taylor, but also deprived the jury of an explanation of the prior acts of domestic violence described by his ex-wife. Moreover, counsel's poor planning and decision to introduce evidence of mental illness through Dr. Draper, rather than a qualified expert, led the jury to believe he was not mentally ill, was not receiving psychotic medications to maintain his competency, and worst of all, that he was a malingerer.

This error was compounded by limitations placed on the scant evidence that was presented. The jury was instructed it could not consider any of this as mitigation unless "it reduced Mr. Harris's culpability." This errant instruction was used as a tool by Prosecutor High to systematically discredit each of the mitigating factors – a result the OCCA agreed "would be an egregious misstatement of the law." *Harris*, 164 P.3d at 1114. However, the OCCA held this "egregious" error was cured by Mr. Lane's final argument. *Id*.

However, Prosecutor Lane's "cure" came immediately after he re-read the sympathetic pleas by Mr. Taylor's wife, son, and grandchildren — an intentional violation of *Booth*. Mr. Lane immediately followed with the argument that no matter what punishment the jurors selected, someone would be "mad" or "upset," turning

104

the selection of penalty into a contest between the Taylor and Harris families. Prosecutor Lane's "cure" told the jury to decide whether "these mitigation issues that Mr. Rowan has brought up really override the day of terror, and a day that took a couple of weeks to think through." 2005 Tr. Vol. 6 at 982-83. With all due respect, this was not a cure for the egregious misstatement of the law in the written instruction or the argument of Prosecutor High – it compounded it.

This is a case, like *Cargle*, where the individual Constitutional violations had a "synergistic" effect.[35] 317 F.3d at 1221. The errors in Mr. Harris's case, reviewed in the Eighth Amendment context, reveal "no principled distinction between whether that (error) results from the acts of the prosecution or an ill-prepared defense counsel." *Stouffer v. Reynolds*, 214 F.3d 1231, 1235 n.4 (10th Cir. 2000). Each error resulted in the omission of evidence from the jury's proper consideration, resulting in a verdict not worthy of confidence.  In *Grant v. Trammell,* 727 F.3d 1006, 1026 (10th Cir. 2013), this Court held to establish cumulative error,  Mr. Harris must show the several errors in his case, "when considered additively, prejudiced him" to the extent that relief is required. *Grant* approved an alternative approach to the

---

[35] Synergism is the interaction of elements that when combined produce a total effect that is greater than the sum of the individual elements, from the Greek synerg(ós) "working together." *Random House Webster's College Dictionary*, New York 2005.

cumulation of Constitutional error — that a defendant can establish "cumulative error by accumulating unrelated errors if their probabilistic sum sufficiently undermines confidence in the outcome." *Id.*

In *Woodson*, the court explained:

[A] process that accords no significance to relevant facets of the character and record of the individual offender . . . excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailities of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings.

428 U.S. at 304. A defendant has little or no chance of avoiding the death sentence unless his counsel gives the jury something to counter "the horror of the crime." *Romano v. Gibson*, 239 F.3d 156, 1180 (10th Cir. 2001). The "process" or combination of errors in this case made a death sentence inevitable.

Under de novo review, the accumulation of these Eighth Amendment errors "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. When the prejudice from these errors is viewed cumulatively, there is a strong probability that the Constitutional irregularities influenced the jury and deprived Mr. Harris of a fair and reliable sentencing proceeding and should undermine this Court's confidence in the outcome.

## CONCLUSION

Mr. Harris  respectfully requests this Court reverse with instructions to grant the Writ as to the claims detailed herein, or alternatively, reverse and remand with instructions to hold an evidentiary hearing.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel requests oral argument.  Due to the complex issues presented in this capital case, oral argument would be of material assistance to the Court.

Respectfully submitted,

*s/ Jack Fisher*
Jack Fisher, OBA # 2939
Post Office Box 1976
Edmond, Oklahoma 73083
(405) 235-9466
Facsimile (405) 340-7269
E-mail: Okfishlaw@aol.com

*s/ Emma V. Rolls*
Emma V. Rolls, OBA # 18820
Assistant Federal Public Defender
Capital Habeas Unit
215 Dean A. McGee, Suite 707
Oklahoma City, OK  73102
(405) 609-5975
Facsimile (405) 609-5976
E-mail: Emma_Rolls@fd.org

COUNSEL FOR PETITIONER,
JIMMY DEAN HARRIS

## CERTIFICATION OF DIGITAL SUBMISSION

I certify that with respect to the foregoing Petitioner/Appellant's Opening Brief that: (1) all required privacy redactions have been made pursuant 10th Cir. R. 25.5; (2) the hard copies required to be submitted to the clerk's office are exact copies of the ECF filing, and (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection, Version 12.1.1000.157.105, updated daily, and, according to the program, is free of viruses.

Dated July 2, 2018.

*s/ Jack Fisher*
Jack Fisher


## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.   This document, Petitioner/Appellant's Opening Brief, complies with the type-volume limitation of Fed. R. App. P. 32(g), 32(a)(7)(B), and with this Court's Order dated January 5, 2018, because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this document contains 24,996 words.

2.   This document, Petitioner/Appellant's Opening Brief, complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Word Perfect Version X5 in 14-point Times New Roman font.

Dated July 2, 2018.

*s/ Jack Fisher*
Jack Fisher

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 2, 2018, I electronically filed the foregoing Petitioner/Appellant's Opening Brief using the Court's CM/ECF System for filing, which will send notification of such filing to the following registrant:

Jennifer L. Crabb, Assistant Attorney General
fhc.docket@oag.ok.gov; jennifer.crabb@oag.ok.gov

I further certify that on July 2, 2018, in accordance with 10th Cir. R. 31.5, I mailed, via Federal Express, seven hard copies of this document exactly as filed to:

Elisabeth A. Shumaker, Clerk of Court
Byron White United States Courthouse
1823 Stout Street, Denver, Colorado 80257

*s/ Jack Fisher*
Jack Fisher

109